The People ex rel. The Manhattan Railway Company, Respondent, v. Edward P. Barker et al., as Commissioners of Taxes and Assessments of the City of New York, Appellants.

| 165 | 305 |
| 172 | 593 |
| 165 | 305 |
| 78 | AD⁸316 |

1. Appeal — Findings of Fact by Special Term at Variance with Referee's Findings. The findings of a referee, appointed to take evidence and report to the court with his findings and conclusions, do not become the findings of fact in the case, unless they are approved by the Special Term, and where the Special Term makes findings of facts at variance with those of the referee, its findings become the findings in the case that are brought up for review in the Appellate Division by an appeal taken from an order of the Special Term made upon the evidence returned in the referee's report, and further evidence introduced before it

2. Reversal of Order Vacating Assessment. The Court of Appeals, on appeal from an order of the Appellate Division, reversing a final order of the Special Term in a proceeding by certiorari to review an assessment, which involved a trial of an issue of fact, the commissioners of taxes and assessments claiming that the relator had taxable assets of great value, and the relator that it had none, is required by sections 1338, 1361 of the Code of Civil Procedure, to assume that the reversal was not upon the facts, but upon some error of law, unless the contrary clearly appears in the record body of the order appealed from.

3. Tax — Deduction of Indebtedness of Street Railway Company. Indebtedness incurred by a street railway company in the purchase of franchises cannot be deducted from its assets for the purpose of determining the proper assessment for municipal taxes for the year 1894, since such franchises were not then taxable and consequently fell within the express provision of the Revised Statutes (1 R. S. 391, § 9, subd. 4, amd. L. 1892, ch. 202) prohibiting the deduction of indebtedness incurred in the purchase of non-taxable property.

4. Appeal — Finding, When Conclusive upon the Court of Appeals. A finding by the Special Term in certiorari proceedings to review an assessment upon the property of a street railway company for the purposes of taxation, upon the question whether certain indebtedness was contracted in the purchase of franchises, is purely one of fact, and, if it has support in the evidence, cannot be reviewed by the Court of Appeals upon appeal from an order of the Appellate Division reversing the order of the Special Term upon the law and not upon the facts.

5. Finding of Value. The value of an item denominated "open accounts," included in the assessment, representing the expenditures of the company upon the structure of another company, and on account of land damages paid for that company, is also purely a question of fact for the determination of the trial court and its findings, if supported by the evidence, cannot be disturbed by the Court of Appeals.

6. Assessment of Property of Elevated Railway Company — Fee Damages as Assets. Fee damages paid by an elevated railroad company to abutting owners represent property that may be assessed, but damages paid on account of past interference with their use of easements of light, air and access do not form a basis upon which any valid assessment can be made, since no right or property of value is acquired by the railroad company in consequence of such payments.

7. Taxation of Corporate Property — Evidence of Impairment of Capital Stock. The commissioners of taxes and assessments are justified in assuming that the capital stock of a corporation remains unimpaired, where it appears that it has paid a dividend annually of six per cent; but evidence may be introduced showing that it has been impaired by the existence of debts, which evidence, if believed, overcomes the presumption that might otherwise exist.

8. Proper Relief on Appeal to Appellate Division. Upon appeal from an order of the Special Term in a certiorari proceeding confirming an assessment of corporate property made by the commissioners of taxes and assessments, the Appellate Division may modify the order or reverse it and send the proceedings back for a reassessment, but should not vacate the assessment absolutely where it appears that there is property properly assessable, and it is not contended that any improper basis was adopted in determining the amount of the taxable assets of the relator, and the questions raised have reference to the items which should or should not be included in making up the value of the assets.

9. Deduction of Surplus. The "surplus profits or reserve funds" contemplated by section 3 of chapter 456 of the Laws of 1857, providing that "the capital stock of any company liable to taxation, except such part of it as shall have been excepted in the assessment roll, or as shall have been exempted by law, together with its surplus profits or reserve funds exceeding ten per cent of its capital * * * shall be assessed at its actual value and taxed in the same manner as other personal and real estate of the company," are the accumulations of the company of moneys or property in excess of the par value of the stock issued by it; and if,

1901.] People ex rel. Manhattan Ry. Co. v. Barker. 307

N. Y. Rep.] Statement of case.

alter the real estate and personal property is assessed at its actual value, no surplus over the par value of the stock is shown, or if such surplus does not exceed ten per cent of the capital stock, there is nothing to assess as surplus and nothing from which the ten per cent of the capital can be deducted.

*People ex rel. Manhattan Ry. Co.* v. *Barker*, 48 App. Div. 248, reversed.

(Argued October 3, 1900; decided November 27, 1900; motion for reargument submitted January 7, 1901; denied January 22, 1901.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, made March 1, 1900, reversing a final order of Special Term which dismissed a writ of certiorari to review an assessment against the property of the relator, and vacating such assessment.

The facts, so far as material, are stated in the opinion.

*John Whalen, Corporation Counsel* ( *William L. Turner* and *James M. Ward* of counsel), for appellants. The finding of the Special Term, that the indebtedness of the relator respecting $9,500,000 of the bonds of the New York Company evidenced by $8,500,000 of the latter's first mortgage bonds and by $1,000,000 of its debentures, was directly contracted by the relator in the acquisition of the New York Company's railroad franchises; and that $1,127,112 of its own first mortgage bonds represented a cash payment concededly made for the same purpose, amounting in all to $10,627,112, was supported by undisputed evidence, and was the determination of a fact based on competent evidence which the court below not only did not reverse but with which it had no power to interfere. (*People ex rel.* v. *Dederick*, 161 N. Y. 195; *Matter of N. Y. El. R. R. Co.*, 43 N. Y. S. R. 651; *Matter of M. El. R. R. Co.*, 12 N. Y. Supp. 511; *Prouty* v. *L. S. & M. S. Ry. Co.*, 52 N. Y. 363; *Boardman* v. *L. S. & M. S. Ry. Co.*, 84 N. Y. 181; *Polhemus* v. *F. R. R. Co.*, 123 N. Y. 502; *Shepherd* v. *May*, 115 U. S. 505; *Belmont* v. *Coman*, 22 N. Y. 438; *Calvo* v. *Davies*, 73 N. Y. 211; *Burr* v. *Beers*, 24 N. Y. 178.) The cash land damage payment of $7,932,981 was made from the proceeds of $8,814,423.33 of Manhattan first mortgage bonds issued at ninety per cent of par, and the whole of this

latter amount measures the value of a right of property acquired from abutters along the lines both of the Metropolitan and New York companies, whether part of the payment was made for " rental " damages or not, and such amount was either represented in the taxable property of the relator on assessment day in 1894, as part of the cost of reproducing its structures, or it was represented by " non-taxable " property, in which case the indebtedness contracted in its acquisition, evidenced by these bonds, claimed and allowed as offsets by the courts below, is non-deductible under the statute of 1892. (*People ex rel.* v. *Davenport*, 91 N. Y. 574; *Kane* v. *N. Y. El. R. R. Co.*, 125 N. Y. 164; *Lahr* v. *Met. El. Ry. Co.*, 104 N. Y. 268; *Story* v. *N. Y. El. R. R. Co.*, 90 N. Y. 122; *People ex rel.* v. *Hilts*, 27 Misc. Rep. 295; *Fobes* v. *R., W. & O. R. R. Co.*, 121 N. Y. 505.) The $1,488,035 of Manhattan first mortgage bonds, which represent unpaid dividends to stockholders, and which the Special Term allowed as a deductible item of indebtedness, but which the Appellate Division has not considered, should be refused as a legal offset, if necessary, to sustain the reassessment in whole or in part. (*People ex rel.* v. *Barker*, 23 App. Div. 532; *People ex rel.* v. *Bd. of Assessors*, 76 N. Y. 202.) The determination of the Special Term that in valuing the structures of the appellant the estimate is to be based on cost and earning capacity; its rejection of the figure adopted by the referee of $8,770,587 as the value of this item, being the cost of their reproduction at the market price of labor and materials only on a given day, and involving, as it did, their entire non-existence and the suspension of the appellant's business for at least two years, and its tentative acceptance as a partial value of the higher figure of $11,542,242.22, based upon the incomplete statement furnished by the relator of the original cost in cash of this detail of its assets, being its own valuation as shown by its books, were clearly sound, and this latter figure should be adopted rather than the figure suggested by the Appellate Division, which simply adds six per cent per annum for two years to the referee's cost of replace-

ment. (*People ex rel.* v. *Barker*, 31 App. Div. 315 ; 158 N. Y. 709 ; *People ex rel.* v. *Barker*, 144 N. Y. 94 ; *Brooklyn El. R. R. Co.* v. *City of Brooklyn*, 11 App. Div. 131 ; *Fealey* v. *Bull*, 163 N. Y. 397 ; *People ex rel.* v. *Barker*, 146 N. Y. 315.)

*John F. Dillon, David B. Hill, Julien T. Davies* and *Brainard Tolles* for respondent. The Appellate Division was right in determining the actual value of the capital stock of the relator by a direct valuation of its assets and liabilities, rather than by presumptions or intricate theories. (*People ex rel.* v. *Coleman*, 126 N. Y. 433 ; *People ex rel.* v. *Feitner*, 41 App. Div. 573 ; *People ex rel.* v. *Barker*, 139 N. Y. 61 ; *People ex rel.* v. *Barker*, 141 N. Y. 255 ; *People ex rel.* v. *Dederick*, 25 Misc. Rep. 539 ; *People ex rel.* v. *Neff*, 19 App. Div. 601 ; *People ex rel.* v. *Dykes*, 45 N. Y. S. R. 621 ; 64 Hun, 634 ; *People ex rel.* v. *Roberts*, 37 App. Div. 1 ; *People ex rel.* v. *Barker*, 7 App. Div. 27 ; *People ex rel.* v. *Barker*, 16 Misc. Rep. 252.) The Appellate Division was right in valuing the relator's railroad structures according to the cost of replacement. (*People ex rel.* v. *Clapp*, 152 N. Y. 490 ; *People ex rel.* v. *Hilts*, 27 Misc. Rep. 290 ; *People ex rel.* v. *Dolan*, 126 N. Y. 166 ; *People ex rel.* v. *Davenport*, 91 N. Y. 574 ; *Hubbard* v. *Brainard*, 35 Conn. 563, 568 ; *Varick* v. *Briggs*, 6 Paige's Ch. 323 ; *W., etc., R. Co.* v. *Cœur d'Alene Nav. Co.*, 160 U. S. 77 ; *Savings Bank* v. *Nashua*, 46 N. H. 389 ; *People ex rel.* v. *Barker*, 16 Misc. Rep. 258 ; *People ex rel.* v. *Kalbfleisch*, 25 App. Div. 432.) The Appellate Division was right in holding that the bonded indebtedness originally incurred by the New York Elevated Railroad Company was to be deducted in determining the value of the capital stock of the relator. (*People ex rel.* v. *Barker*, 155 N. Y. 330 ; *People ex rel.* v. *Dederick*, 161 N. Y. 195 ; *Polhemus* v. *F. R. R. Co.*, 123 N. Y. 502 ; *Tompkins* v. *A. S. R. Co.*, 102 Ga. 436 ; *Arbuckle* v. *M. R. Co.*, 81 Ill. 429 ; *C., etc., R. Co.* v. *Moffit*, 75 Ill. 524 ; *L., etc., R. Co.* v. *Boney*, 117 Ind. 501 ; *Berry* v. *K. C., etc., R. Co.*, 52 Kans. 774 ; *Dodson* v. *B., etc., R. Co.*, 77 Md. 489 ; *N. B., etc., R. Co.* v. *O. C. R. Co.*, 120 Mass. 397.)

The Appellate Division was right in holding that all the bonded indebtedness of the relator was to be deducted in determining the value of its capital stock. (*People ex rel. v. Barker*, 23 App. Div. 532; *People ex rel. v. Bd. of Assessors*, 76 N. Y. 202.) The Appellate Division erred in estimating the open account against the Metropolitan Elevated Railway Company at its face value instead of its actual value. (*People ex rel. v. Feitner*, 51 App. Div. 178.) The Appellate Division erred in holding that the sum of $2,320,658.74 paid by relator as fee damages to abutting property was to be included in the cost of replacement of its railroad and the assessed value of its real property. (*People ex rel. v. Hilts*, 163 N. Y. 594; *People ex rel. v. Clapp*, 152 N. Y. 49; *People ex rel. v. Hilts*, 27 Misc. Rep. 290; *Newman v. M. El. Ry. Co.*, 118 N. Y. 618; *Bohm v. M. El. Ry. Co.*, 129 N. Y. 576; *Bookman v. N. Y. El. R. R. Co.*, 137 N. Y. 302; *Sperb v. M. El. Ry. Co.*, 137 N. Y. 596; *S. A. R. R. Co. v. M. El. Ry. Co.*, 138 N. Y. 548; *Lazarus v. M. El. Ry. Co.*, 69 Hun, 191; *Parmenter v. Fitzpatrick*, 135 N. Y. 196.) The Appellate Division did not exceed its powers in directing the assessment to be stricken from the roll. (Code Civ. Pro. §§ 1022, 1317, 1361; *Matter of Chapman*, 162 N. Y. 456; *Wood v. Baker*, 60 Hun, 337; *Stanley v. Crowe*, 19 N. Y. S. R. 828; *Wood v. Bd. Suprs.*, 30 N. Y. S. R. 706; *Ross v. Caywood*, 162 N. Y. 262; *New v. Vil. of New Rochelle*, 158 N. Y. 41; *Hendrickson v. City of New York*, 160 N. Y. 144; *Howells v. Hettrick*, 160 N. Y. 308; *Benedict v. Arnoux*, 154 N. Y. 715.)

HAIGHT, J. The commissioners of taxes and assessments for the city of New York originally assessed the property of the relator for the purpose of taxation for the year 1894 at $17,860,712. Upon review that assessment was vacated and set aside and a reassessment ordered by this court. (146 N. Y. 304.) Thereupon the commissioners of taxes reassessed the property of the relator for that year at the sum of $15,526,800. The relator then instituted proceedings by cer-

1901.]   People ex rel. Manhattan Ry. Co. v. Barker.   311

N. Y. Rep.]        Opinion of the Court, per Haight, J.

tiorari to review the assessment so made, and upon the return
of the writ an order was entered appointing a referee to take
evidence upon all of the issues in the case and to report to the
court his findings of fact and conclusions of law with all con-
venient speed.   The referee so appointed, after taking the
evidence submitted by the parties, made his report to the
court, containing findings of fact and conclusions of law, which
conclusions were to the effect that the reassessment of the
relator's property was erroneous and illegal and should be
wholly vacated and set aside.   The case was then brought to
a hearing before the Special Term upon the evidence returned
in the referee's report, and the further evidence of a mort-
gage made on the 26th day of November, 1890, between the
Manhattan Railway Company and the Metropolitan Elevated
Railroad Company of the first part, and the Central Trust
Company of New York of the second part, and after such
hearing the court made a final order, containing specific find-
ings of facts, in which some of the facts found by the referee
were approved and others were not, and concluded by con-
firming the assessment made by the commissioners and dismiss-
ing the writ.   Thereupon an appeal was taken by the relator
to the Appellate Division, which resulted in an order reversing
the order of the Special Term and vacating the assessment.

The chief controversy arises out of the claim of the relator
that the items for open accounts, $6,217,939.79, and land dam-
ages, $8,814,423.33, should be stricken from the amount of its
assets and that there should be added to the amounts allowed
by the Special Term as deductions from the relator's assets
the following items :

| | |
|---|---|
| New York first mortgage bonds................. | $8,500,000.00 |
| New York debenture bonds................. | 1,000,000.00 |
| And Manhattan bonds ................. | 1,127,112.00 |
| Making a total of................. | $10,627,112.00 |

The first question which it becomes necessary to consider
has reference to the power of the court upon this review.   As
we have seen, the case was referred to a referee, not to hear,

312 People ex rel. Manhattan Ry. Co. v. Barker. [Jan.,

Opinion of the Court, per Haight, J.          [Vol. 165.

try and determine, but to take the evidence and report to the court, with his findings and conclusions. The findings of the referee, therefore, do not become the findings of fact in the case unless they are approved by the Special Term. In this case the Special Term made findings of fact with reference to the disputed items, at variance with the findings of the referee. The findings of the Special Term thereupon became the findings in the case that were brought up for review in the Appellate Division by the appeal that was taken from the order of the Special Term. The Appellate Division has reversed the order of the Special Term, but in the order entered it has not stated that the reversal was upon the facts. This is a special proceeding involving a trial of an issue of fact, the commissioners claiming that the company has taxable assets of great value, and the relator that it has none. Section 1361 of the Code of Civil Procedure, in making provision for a review of special proceedings, provides that " The proceedings upon an appeal, taken as prescribed in this title, are governed· by the provisions of this act, and of the general rules of practice, relating to an appeal in an action, except as otherwise specially prescribed by law." Section 1338 provides for a review in the Court of Appeals of judgments entered in actions and that upon an appeal to that court "from a judgment, reversing a judgment entered upon the report of a referee, or a determination in the trial court; or from an order granting a new trial, upon such a reversal; it must be presumed that the judgment was not reversed, or the new trial granted, upon a question of fact, unless the contrary clearly appears in the record body of the judgment or order appealed from." Under these sections we are required to assume that the order of the Special Term was not reversed upon the facts, but that the reversal was upon some error of law. (*Matter of Chapman,* 162 N. Y. 456; *Wetmore* v. *Wetmore,* 162 N. Y. 503; *People ex rel. Manhattan Ry. Co.* v. *Barker,* 152 N. Y. 417; *Matter of Keefe,* 164 N. Y. 352.)

Considering the facts, therefore, to be as found by the Special Term, we proceed to inquire whether there were errors of

1901.]  People ex rel. Manhattan Ry. Co. *v.* Barker.  **313**

N. Y. Rep ]        Opinion of the Court, per Haight, J.

law presented which justified a reversal.   It is not contended that any improper basis was adopted in determining the amount of the taxable assets of the relator.   The questions raised have reference to the items which should or should not be included in making up the value of the assets.

We will first consider the items which the relator claims should be deducted from the amount of the assets found to belong to it.   The three items above referred to may properly be considered together.   The Special Term finds as follows:

"22nd. Prior to the second Monday of January, 1894, the Manhattan Railway Company had paid for the franchise to operate an elevated railway in certain streets and avenues in the city of New York, to the New York Elevated Railroad Company and to the Metropolitan Elevated Railway Company, in addition to other sums agreed to be paid for the same purpose, the sum in cash of one million and fourteen thousand dollars ($1,014,000)."

27th.  "That of the said eleven million six hundred sixty-three thousand and thirty-five dollars ($11,663,035) of the mortgage bonds of the Manhattan Railway Company, at least one million one hundred twenty-seven thousand one hundred and twelve dollars ($1,127,112) represented the payment specified in the foregoing 22nd paragraph of one million and fourteen thousand dollars ($1,014,000), by the said Manhattan Railway Company *for franchises* to operate elevated railways in certain streets and avenues in the city of New York to the New York Elevated Railroad Company and to the Metropolitan Elevated Railway Company, the bonds so representing said sum having been issued for cash at ninety per cent of their par value."

29th.  "That the liability of the Manhattan Railway Company, created by certain promises to pay the eight million five hundred thousand dollars ($8,500,000) of mortgage bonds of the New York Elevated Railroad Company and the one million dollars ($1,000,000) of debenture bonds of the same company contained in said leases and said merger agreement hereinbefore referred to, was directly incurred in the *purchase* and *acquisition of the franchises* of the said New York Elevated Rail-

314 People ex rel. Manhattan Ry. Co. *v.* Barker. [Jan.,

Opinion of the Court, per Haight, J.    [Vol. 165.

road Company to maintain and operate its lines of elevated railway in certain streets and avenues in the city of New York, and its indebtedness respecting the same was contracted for such purpose."

38th. "That of its total indebtedness of $21,907,590.35, $9,500,000 was incurred by the relator in the *purchase of its franchises*, as determined in the foregoing 29th paragraph, and $1,127,112 *for a like purpose*, as determined in the foregoing 27th paragraph."

It will thus be seen that as to each of the three items of indebtedness, amounting in the aggregate to $10,627,112, the finding is express that it was contracted by the relator in the purchase of franchises which are not taxable for town, county or municipal purposes, and, consequently, cannot be deducted from its assets under the express provision of 1 R. S. 391, sec. 9, subd. 4, as amended, Laws 1892, chap. 202, which prohibits the deduction of indebtedness incurred in the purchase of non-taxable property. (*People ex rel. Cornell Steamboat Company* v. *Dederick*, 161 N. Y. 195.) It is contended that these findings are erroneous. It is true that they are at variance with the findings made by the referee, but, as we have seen, the findings of the referee as to these items have not been ratified by the Special Term, and, consequently, they constitute no part of the facts brought up for review in the Appellate Division. That court, as we have already shown, has reversed upon the law and not the facts. The facts, therefore, as found by the Special Term, are deemed to stand as the facts in the case, unless it can be held that there is no evidence in the case tending to support them. Upon that question we are required to take into consideration the history of the organization of the relator, its purpose, and the contracts that were entered into by it, with the inferences of fact that may be drawn therefrom. Doing this, we think that it cannot be properly held that the findings are without support from the evidence. The question as to whether the indebtedness was contracted in the purchase of franchises is purely one of fact, and we find no question of law involved as to

1901.] People ex rel. Manhattan Ry. Co. *v.* Barker. 315

N. Y. Rep.]      Opinion of the Court, per Haight, J.

these items upon which a reversal could properly have been founded by the Appellate Division.

The next question in controversy relates to the item of $6,217,939.79, denominated "open accounts." The referee found the amount to be $2,023,487.57. The Special Term found that they amounted in the aggregate to the sum first named. The open accounts represent the relator's expenditures upon the structure of the Metropolitan Elevated Railway, of the amount found by the referee, and the balance found by the Special Term was for expenditures on account of land damages paid for that company. The counsel for the relator now concedes that the amount of open accounts, as found by the Special Term, at the time stood upon the books of the company as a valid asset against the Metropolitan Railroad Company, but as we understand its contention, it is that the Special Term erred in assessing this item at its face value, for the reason that its actual value did not exceed the sum of $166,667. Whether these open accounts were of the value of one dollar, one hundred thousand dollars, or six million dollars, was purely a question of fact for the determination of the trial court. The opinion of the Appellate Division approves of this item as found by the Special Term, and under the Constitution, which limits this court to the review of questions of law, we think we have no jurisdiction to review that determination.

The other and perhaps the most troublesome question presented for our consideration relates to the item of land damages, $8,814,423.33, of which ninety per cent, $7,932,980.99, was realized. Of this sum $4,451,993.49 was paid for land damages on the Metropolitan line, and is included in the item of open accounts. Of the balance, $3,480,987.50, $1,160,329.37 thereof was paid for rental damages of the New York line and $2,320,658.13 for the fee damages, so called, on that line. It is contended on behalf of the relator that these damages do not constitute taxable assets. We are inclined to the view that this contention presents a question of law which it is the duty of this court to determine. We have presented two elements of damages: One consists of

316   People ex rel. Manhattan Ry. Co. v. Barker.   [Jan.,

Opinion of the Court, per Haight, J.          [Vol. 165.

payments made to abutting property owners on account of the relator's interference with or use of their easements of light, air and access, while the other consists of payments made to such owners by the relator in acquiring such easements, with a perpetual right to operate its railroad in front of such abutting property.   There is a difference between the two elements of damages here referred to.   The operating of an elevated railroad in a street in front of abutting property without acquiring from the owners the right so to do is an interference with and a partial destruction of such owners' easements of light, air and access.   The structure is, therefore, to that extent unauthorized and illegal, and the company operating it is deemed to be a trespasser upon the right of such owners. Hence, in an action brought to recover damages for such use, the company becomes liable for all of the damages that it has caused by reason of its unlawful structure, not only for its impairment of the owners' easements of light, air and access, but also for its interference with their privacy and their convenience.   For the damages so recovered, no right or property of value is acquired by the railroad company. It is for others' property rights destroyed and for injuries inflicted upon others that the company is compelled to make compensation in damages.   Such damages, consequently, do not form a basis upon which any valid assessment can be made. It is quite different, however, as to the damages ordinarily denominated " fee damages."   Such damages are awarded for rights acquired from others for all time to come, or at least during the existence of the railroad company.   The rights acquired are the easements of light, air and access of the abutting property owners in the streets occupied by the elevated railroad structure, and when these easements are acquired by the company its structure becomes lawful and its right to operate its road in front of the abutting property unquestioned.   (Messenger v. Manhattan R. Co., 129 N. Y. 502.)   The acquirement of these easements, it is true, destroys in a measure the value of the abutting property, but to the extent that such value is destroyed, that of the railroad com-

pany is increased.  We think, therefore, that the fee damages represent property that may be assessed.  The case of *People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Hilts* (27 Misc. Reports, 290), which has been affirmed in this court, is clearly distinguishable from the case that we now have under consideration.  In that case the railroad was upon the surface of the ground.  There was no infringement upon the easements of light, air and access of the abutting owners.  Their property was damaged by reason of its proximity to the railroad, and that was all.  The railroad company in that case had acquired its right of way years before, when the consequential damage to the abutting property may have been very different from what it was at the time the proceedings were instituted.  Under the peculiar circumstances presented by that record this court saw fit to approve of the determination made by the Special Term ; but the question we now have under consideration relates to the fee damages of an elevated structure, an entirely different question, and one which was not considered in that case.

The Special Term, as we have seen, found that the value of the relator's assets, after making the proper deductions, was $14,440,641.58.  Also that the relator had paid an annual dividend of six per cent upon its capital stock of $29,925,200, and had a surplus besides.  And, finally, that the commissioners were justified in assuming that the capital stock of the relator remained unimpaired, and that the assessable value of its assets was $15,526,800, as determined by the commissioners, and that their assessment should be confirmed.  In the case of *People ex rel. Equitable Gas Light Company* v. *Barker* (144 N. Y. 94), and also in this case on the former hearing (146 N. Y. 304), this court held that such a presumption may be indulged in.  Evidence, however, may be introduced showing that the capital stock of a company is impaired by the existence of debts, which evidence, if believed, overcomes the presumption that might otherwise exist.  In this case the indebtedness disclosed by the relator consisted of mortgages, bonds and judgments, about which there now appears to be no controversy

as to the facts.   It would seem, therefore, that the presumption was overcome by the evidence, and the assessment should be made in accordance with the testimony and not based upon the presumption that the capital stock remained unimpaired.

The Appellate Division appears to have found that the structure in the streets cost $9,823,057, instead of $8,770,587, as found by the referee.   It also found that the judgments unpaid of $744,555.35 had been obtained for land damages, of which $248,185.11 was for rental damages and the rest was for fee damages.   We fully agree with the learned Appellate Division with reference to its disposition of these items. Indeed, we do not understand them to be seriously questioned. We agree fully as to the assets, and only differ as to the deductions of the items first considered by us.

Assets as found by the Appellate Division :

| | |
|---|---:|
| Real estate and other structures.............. | $5,120,216.00 |
| New York equipment......... .. ....... | 2,213,602.59 |
| Suburban equipment.................. ..... | 142,175.13 |
| Cash.................................... | 1,382,838.00 |
| Tools and machinery....................... | 381,538.09 |
| Structure in streets ..................... | 9,823,057.00 |
| Open accounts..... :................. ...... | 6,217,929.79 |
| Land damages............................ | 2,320,658.13 |
| Total............................. ...... | $27,602,014.73 |

Deductions :

| | | |
|---|---:|---:|
| Manhattan bonds issued for dividend scrip........... | $1,488,035.00 | |
| Manhattan bonds issued for land damages........... | 8,814,423.33 | |
| Manhattan bonds not specifically appropriated........ | 235,864.67 | |
| Judgments................ .. | 248,185.11 | |
| Assessed value of real estate.. . | 7,323,200.00 | |
| Total deductions.............. ............... | | 18,109,708.11 |
| Remaining assets....... ............... | | $9,492,306.62 |

The Appellate Division could have modified the order of the Special Term or it could have reversed the order and sent the proceedings back for a reassessment. It, however, should not have vacated the assessment absolutely.

The order of the Appellate Division should be reversed and the order of the Special Term modified so as to reduce the assessment of the relator's property to the sum of $9,492,306.62, and as so modified affirmed, with costs of this appeal to the appellants.

O'Brien, J. (dissenting). This is a controversy of long standing between the relator and the commissioners of taxes. It involves only one general question, and that is the actual value of the relator's capital stock for the purpose of taxation, under the act of 1857. On the first Monday of January, 1894, the defendants assessed the stock at $30,000,000, that being the nominal or par value. At the same time they assessed the relator's real estate and railroad structure at $7,323,200. The latter assessment has never been questioned, and there is no controversy here about it. The defendants, on relator's application, reduced the assessment on the capital stock to something less than $18,000,000 and the relator then sued out a writ of certiorari, to which the defendants made a return of all of their proceedings. After a hearing upon the writ and return, the court at Special Term set aside and vacated the assessment entirely. The court at General Term reversed the order and restored the assessment, and the relator then appealed to this court. This court reversed the General Term and ordered a new assessment. (146 N. Y. 304.) The defendants proceeded to make a new assessment, in which they valued the capital stock at something less than $17,000,000. Upon a rehearing they reduced it to $15,526,800, and the relator sued out another writ of certiorari, to which a return was made. The court appointed a referee to take proof and report the facts and his opinion on the law, and he reported that the assessment should be vacated. The court at Special Term, however, overruled the report, and confirmed the assessment, and the relator appealed to the Appellate Division, and

that court, not agreeing in all respects with the referee, arrived at the same result and reversed the Special Term and vacated the assessment.

The case comes here upon a series of facts as to which there is no dispute, though there is much dispute about the legal effect of those facts and other matters of law. There is no dispute with respect to the several items of property, real or personal, which the relator owned at the time of the assessment, and which represent the value of its capital stock. Nor is there any dispute with respect to the relator's indebtedness. Every item of it has been fully disclosed and found. The controversy is limited to the contention of the defendants that certain items of expenditure which appear upon the relator's books represent taxable property, and that certain debts which are conceded to be existing outstanding obliga tions for which the relator is liable are not deductible under the statute. These are questions of law. The amount, origin and history of these several items appear from findings in the record without dispute or conflict, and in such a case the form of the order of reversal is not material. (*O'Brien* v. *East River Bridge Co.*, 161 N. Y. 539; *Benedict* v. *Arnoux*, 154 N. Y. 715; *Griggs* v. *Day*, 158 N. Y. 1; *Hirshfeld* v. *Fitzgerald*, 157 N. Y. 166.)

This court, therefore, has power to review all the questions that were passed upon in the court below, for the reason that the facts that underlie these questions are not the subject of dispute. It is true that the Special Term found that certain items in the relator's statement represented taxable assets which had been rejected as such by the referee, and that certain debts which the referee had allowed as deductible should not be allowed, since they were contracted by the relator in the purchase of non-taxable property. But the Special Term differed from the referee with respect to the law, and not as to the facts. No one claims that the relator had any more property than is detailed in the findings of the referee, or that any of the debts there stated are not existing outstanding obligations of the relator.

1901.] People ex rel. Manhattan Ry. Co. v. Barker. 321

N. Y. Rep.]      Dissenting opinion, per O'Brien, J.

The process of ascertaining the actual value of the relators' capital stock, or that of any other corporation, would seem to be so simple that it must excite some surprise that such a question should have caused so much litigation in this case, and produced such an apparent conflict of views and opinions. The decisions of this court when followed would enable the parties to solve the questions at issue without much difficulty. But complicated theories concerning the nature of property and of debts have been injected into the discussion and the rules of law applicable to the case have been strained by refined and subtle arguments, and sometimes affected by irrelevant facts. Much importance has been given to the fact that at the date of the assessment the relator's stock sold upon the exchange above par, and dividends were then paid upon it to the holders at the rate of 6 per cent. When the value of the relator's tangible property and the amount of its debts are ascertained and undisputed, we have a safer guide as to the value than the fluctuations of the stock market, or the rate of dividends. The market and the dividends reflect to some extent the earning power of the corporation, and the value of its franchises, but the actual value of the stock for the purposes of taxation must be determined by the actual value of the tangible property that is owned in excess of debts.

The effect of these facts when known and found, as they are in this case, cannot be modified by market quotations, or dividends declared. It may be safely asserted that very few street railroad corporations can show any tangible property to represent the capital stock after deducting debts and the value of real estate, and what is true of these corporations is equally true of many others, and yet the capital stock may sell for a high price in the market and produce a large income for the owners, due entirely to the fact that the corporation has a valuable franchise, or right to collect money from the public in perpetuity for service that costs but a nominal amount when compared with the receipts of the business.

41

It is quite probable that there is no other spot on the face of the globe where the right to maintain and operate a railroad and to collect fares from the public is so valuable as the narrow island upon which this relator's railroad is operated. It has the right in perpetuity to levy tribute upon millions of people who are obliged to use its cars as a means of transit. When we consider the enormous revenues which the relator receives by reason of its favorable location for business, or the exercise of its franchise, we need not be surprised when it is found, as it was by the learned court below, that the capital stock represents no tangible taxable property after deducting the very large debt which it owes, the stock held by it in other corporations which is taxed, and the value of the real estate taxed as such.

The case contains another distracting element unless reduced to its true value. The defendants rely upon the annual report made by the relator to the railroad commissioners upon blanks furnished by that department which called for a statement from the relator concerning the cost of its property. The present system of elevated railroads in New York was originally constructed by two other corporations, namely, the New York Elevated and the Metropolitan railroads. The roads were built largely, if not entirely, by bonds of these corporations issued and sold at a ruinous discount. The relator was incorporated about the year 1879 for the purpose of leasing and operating these railroads. On the 20th of May of that year, it leased the property of both of the original corporations for 999 years. It became bound by the leases to pay the principal and interest on the bonded debt of the two leasing roads, a dividend rental to the stockholders of both roads of ten per cent on their holdings of stock, a cash rental of $10,000 per year to each road, and to keep the property in good condition and thorough repair and to pay all taxes. When the relator entered into these obligations it did not own any property whatever and had no money. It was authorized to issue stock to the amount of $13,000,000, but none of it had yet been issued. The whole

amount was subsequently issued and delivered to the stockholders of the two leasing roads as a bonus in order to induce them to consent to the execution of the leases. The whole of the relator's capital stock was, therefore, practically given away. It had not a dollar's worth of tangible property to show for it.

The lease of the two roads proved to be a ruinous bargain, since it appears that in 1884 the relator was unable to pay the rent reserved and was forced into the hands of a receiver. Then there came a readjustment and modification of the leases by reducing the dividend rental from 10 to 6 per cent, and in some other particulars. Before the relator could regain possession of the property it was obliged to pay out over $1,000,000 more, making in all over $14,000,000 in stock and money that it paid out without receiving any property in return. Then followed a tripartite agreement between the relator and the other two corporations, providing for a merger of the latter in the former under the statute (Laws 1867, chap. 255). Thus it appears that the relator's capital was impaired to the extent of $14,000,000 from the very beginning of its career, and if we add to this impairment the large discounts upon bonds and the enormous sums paid for damages to land that followed the decision in the *Story* case, all of which are included in the cost of the railroad as reported to the railroad commissioners, it will be seen how delusive that report must be as evidence of the actual value of the stock based upon tangible property. The report was substantially a transcript from the relator's books of the cost of the road in stock and bonds subsequently increased by the payment of large sums in damages to abutting property owners. But the question is, not what this property cost in stock, bonds and damages, but its actual value at the date of the assessment.

There is another fact in the case that has been given an importance that it does not deserve. In the month of May, 1893, or a year before the assessment in question was made, the relator's counsel addressed a letter to the tax commis-

sioners, in which he stated that he was authorized by the president of the company to say that if the personal assessment for that year on the whole system did not exceed $12,500,000, the companies would acquiesce. Obviously, this letter is no legal proof of the value of the relator's capital stock for the purpose of taxation either then or the next year when the present assessment was made. It is clear that the defendants did not so regard it, since they proceeded the next year to assess the same property at $30,000,000. Inasmuch as the uncontradicted proof and the findings disclose the value of every item of the relator's property, real and personal, as well as the debts which it is claimed should be deducted, the considerations here referred to have no bearing on the question in dispute, which is the actual value of the relator's tangible property and the debts which constitute proper deduc-. tions to be made therefrom.

Passing to that question, it should be observed that the legal rules for its solution are not involved in any doubt or uncertainty. They have all been deliberately considered and passed upon by this court. The value of the capital stock of a corporation must be ascertained for the purpose of taxation from the actual value of its tangible assets after deducting debts, the assessed value of real estate and the shares of stock held in other corporations subject to taxation as part of the capital stock of the corporation issuing it. (*People ex rel. Union Trust Co.* v. *Coleman,* 126 N. Y. 433; *People ex rel. Manh. Ry. Co.* v. *Barker,* 146 N. Y. 304.) Proof of these facts cannot be arbitrarily rejected by the assessors or the court, and the assessment cannot be supported upon the assumption that they are undisclosed assets, in the absence of evidence tending to show the nature and value of the property supposed to be omitted. (*People ex rel. Edison El. Il. Co.* v. *Barker,* 139 N. Y. 55; *People ex rel. Edison Gen. El. Co.* v. *Barker,* 141 N. Y. 251.) The real estate of a railroad must be valued for the purpose of taxation at not to exceed what it would cost to produce it in the condition at the date of the assessment, which, of course, does not mean

1901.] People ex rel. Manhattan Ry. Co. v. Barker. **325**

N. Y. Rep.] Dissenting opinion, per O'Brien, J.

that one plant is to be removed and replaced by another, but simply what it would cost to produce the property as it is. (*People ex rel. D., L. & W. R. R. Co.* v. *Clapp*, 152 N. Y. 490; *People ex rel. W. U. Tel. Co.* v. *Dolan*, 126 N. Y. 166.) The value of the franchise of a railroad could not be considered by the local assessors in making the assessment at the time the assessment in question was made, although the law may have since been changed by the legislature, nor could the earning power of a corporation, derived from the exercise of such franchise. In the light of these principles this court should examine the disputed items of property and of indebtedness, which are the subject of this controversy. They are not numerous, and the facts in regard to them are not open to any dispute.

1. On the first Monday of January, 1894, the relator had paid to abutting property owners on the line of the road as damages for injury to their real estate the sum of $8,814,423.33. These damages were recovered in actions based upon the authority of the *Story* case and other cases which followed it. The principles upon which these actions have been sustained are quite familiar, and no reference need be made to the long line of cases that subjected the relator to a liability, not foreseen or anticipated when the elevated roads were built. The defendants, in making the assessment, included this large item of land damages as part of the relator's tangible taxable assets, upon the theory that having paid the money it must have received in return an equivalent by accession to its real estate and structures. The mind does not readily comprehend such a method of creating or acquiring wealth. It looks very much like an attempt to "coin a vacuum," if it is permissible to use the very apt expression of a thoughtful man. If an individual should injure his neighbor in person or property, and was cast in damages by the courts as a compensation for the injury, the sum paid would, to that extent, deplete the estate of the wrongdoer, and no one would suppose that by the payment of the judgment he acquired any property. That rule would hold good

**326**  People ex rel. Manhattan Ry. Co. *v.* Barker.  [Jan.,

Dissenting opinion, per O'Brien, J.  [Vol. 165.

in this case, unless it is to be reversed when the party committing the wrong is a railroad corporation instead of a natural person, and no such distinction is conceivable.

The relator by the construction and operation of its railroad in the public streets was held to have invaded the rights of the abutting property owners, and to have diminished the value of the use of their real estate. For this injury to the property rights of others, it was condemned to pay damages and did pay the sum above mentioned. The contention of the defendants is that after paying this vast sum of money the relator was just as well off as it was before it paid anything, since it received an equivalent in property. It may be safely asserted that such a proposition has never before received the sanction of any court. The damages which a party is obliged to pay as compensation for an injury to the property of another are, as to the wrongdoer, a total loss. He is compelled to pay, not because he has purchased or acquired any property, but for the reason that he has destroyed that of another. The referee in his report rejected this item entirely as representing no tangible property, but the Special Term restored it and the Appellate Division reduced the item to $2,320,658.74. The question now is whether it should be included in the relator's assets for any sum whatever. The learned court below reached the result stated by making a distinction between past damages or injuries to rental values and fee damages, so called. It rejected the former, but allowed the latter. There is no real distinction between damages sustained in the past and that which is to accrue in the future. In both cases the damages result from the same wrongful act. The right of the property owner was to bring successive actions for the injury, and recover, in every case, such damages as had been sustained up to the commencement of the action. But a court of equity, in the exercise of its extensive powers, in order to prevent a multiplicity of suits, compelled him to commute the damages to accrue in the future for a gross sum. This gross sum represented just what the rental damages did, namely, the injury to the use of the abutting property. The

damages were ascertained in the one case up to the commencement of the action, and in the other case for all future time; but in both cases the judgment represented precisely the same thing and was based on the same injury or wrongful invasion of property rights.

The mind is easily misled by the fact that under the form of the judgment the payment of the future, or so-called fee damages, entitled the wrongdoer to a conveyance by the property owner as a condition of granting equitable relief against the continuance of the wrongful act.   But this conveyance, so called, conveyed no land or other property.   It was a mere matter of practice which the courts had invented for the purpose of executing their judgments, and which the relator accepted for the purpose of record, and in order to show that the litigation was ended and the injury complained of satisfied.   The payment and satisfaction of the judgment, which represented the entire claim for damages, past and future, would have accomplished the same purpose.   The instrument which the property owner delivered to the relator upon payment of the judgment may for convenience be called a conveyance, or deed, but the name given to it cannot change its real character or its legal effect.   It operated simply to release the right of the property owner to bring successive actions in the future against the relator for the continuing injury.   It seems to me, therefore, to be utterly impossible to state any sound distinction between damages in the past and damages for the future, commuted at a gross sum by the powers of a court of equity.   In both cases the money paid by the relator was a loss, and it acquired no property in return.

This court, as it seems to me, has set the question at rest in a very recent case.   In *People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Hilts*, (27 Misc. Rep. 290), a similar contention was made by the assessors in assessing the real estate of a railroad. It was admitted that the rule of valuation was the sum that it would cost to produce the property at the date of the assessment.   There was a referee in that case as in this and he reported that it would cost, in addition to the value of the land

as land, the sum of $57,475 for land damages to contiguous property. The only question in the case was with respect to this item. The court at Special Term struck it out, holding that it could not be included as an element of property acquired, or to be acquired, by the railroad. It is important here to note the language of the learned judge in deciding the question: " The value of relator's real estate under the principles which govern the defendant's assessment of it was not increased by the payment of these land damages. Those damages did not represent any property which had been acquired by the railroad company. They simply represented property values which had been destroyed. They did not represent any property which the relator had acquired and was in possession of, but they stood in the place of property which had been destroyed by the construction of the road. They did not represent something which was in actual existence, for which an assessment might be properly laid, but they represented values which had been destroyed, and which had ceased to exist." This decision was affirmed at the Appellate Division (47 App. Div. 629), and subsequently in this court (163 N. Y. 594).

The defendants' contention cannot, in my opinion, be reconciled with that decision, or sustained upon any legal principle that I am aware of, and so I conclude that no part of the item for land damages should have been included as property in the assessment in this case.

2. At the date of the assessment the relator had upon its books what appeared to be an open account against the Metropolitan Railway Company for $6,217,939.79. The defendants included the amount of this item in the relator's taxable assets. The referee was of opinion that it did not represent a debt and rejected it, except to the extent of $2,023,487.57, which he allowed against his own judgment, but on the affidavit of one of the relator's officers. The Special Term allowed it in full, and the Appellate Division affirmed that action. There is no dispute about the facts bearing upon this item. It is an open account on relator's

books, but the question is, does it represent a "debt due from a solvent debtor," or a debt due at all, and if so what was its actual value at the date of the assessment? We have seen that at the date of the assessment the relator held all of the property of the Metropolitan Company, the debtor in the account, under a lease in perpetuity. By the terms of this lease, as modified in 1884, the relator agreed at its own expense to complete and operate the railroad of the Metropolitan Company in the same manner as that company was then or at any time thereafter might be required or authorized by law. By the terms of the tripartite or merger agreement the relator assumed all the debts, obligations, causes of action and demands as then or thereafter existing of the Metropolitan Company, and agreed to indemnify and save it harmless therefrom. There was no covenant or promise on the part of the latter company to repay or make good to the relator the expenditures incurred under these provisions of the lease and agreement, but the merger agreement did contain a provision to the effect that the relator should be entitled to so much of the property of the lessor company " as shall equal the amount of the debts, obligations and liabilities hereby assumed or indemnified against, and may make use of such property from time to time as the Metropolitan Company may be compelled to pay or discharge the same." At best this provision secured to the relator, upon certain contingencies, a lien upon the property of the lessor company for expenditures made, but it already held all that property under a lease in perpetuity. The relator opened the account in order to keep a record of the expenditures, and on the first Monday of January, 1894, they amounted to the sum now in dispute as a taxable asset. Something over $2,000,000 of the amount represents cost of construction, and the balance land damages paid.

The only basis for this account as a legal obligation is the lease and merger agreement. But these instruments contemplated the extinction of the lessor company as a legal entity by merger in the relator. That result was not complete at

**330** People ex rel. Manhattan Ry. Co. *v.* Barker. [Jan.,

Dissenting opinion, per O'Brien, J. [Vol. 165.

the date of the assessment, but it became complete in a few months afterwards, and ever since that event the debtor in this account has ceased to exist. The parties must have intended that this debt would not survive the consolidation. The provisions of the instruments referred to, when reasonably construed, can mean nothing more than this : In case the merger for any reason failed, or in case the lessor company for any reason declared the lease forfeited, and became repossessed of all the property, then the relator should have a lien or claim for the expenditures ; but the merger having become complete the relator, under the agreement and the general rules of law, became responsible for the debts of the corporation it had absorbed. When the debtor became merged in the creditor, the debt ceased to exist, and was extinguished. (*Polhemus* v. *Fitchburg R. R. Co.*, 123 N. Y. 502 ; *Mount Pleasant* v. *Beckwith*, 100 U. S. 514 ; *New Bedford R. R. Co.* v. *Old Colony R. R. Co.*, 120 Mass. 397 ; *Dodson* v. *Baltimore & L. R. R. Co.*, 77 Md. 489 ; *Louisville, N. A. & C. R. Co.* v. *Boney*, 117 Ind. 501 ; *Chicago, R. I. & P. R. R. Co.* v. *Moffitt*, 75 Ill. 524 ; *Tompkins* v. *A. S. R. R. Co.*, 102 Ga. 436 ; *Langhorne* v. *Richmond R. Co.*, 91 Va. 369 ; Thompson on Corporations, § 365 ; Morawetz on Corporations, § 956 ; Beach on Corporations, § 343 ; Taylor on Corporations, § 666 ; 1 Rorer on Railroads, p. 38.)

The character of this account is governed entirely by the provisions of the lease and merger agreement. It does not represent a debt unless these instruments so provide. There was no promise to pay, express or implied, and but for the clause providing that the relator should be entitled to so much of the property of the leased company as should equal the amount of the obligations assumed no one would claim that this piece of bookkeeping represented a debt. But these same instruments provided for the utter extinction of the lessor and so-called debtor company just as soon as the statute was complied with by the surrender of the stock. It is inconceivable that under such circumstances the parties to the instruments intended to create a debt absolutely. It was a

conditional provision to secure the relator for its outlay in case the agreement failed.

But if it be assumed that the parties intended to and did create a debt, there are other questions that must be answered. What was the value of the account on the day of the assessment?  Could it have been enforced or collected by the relator on that day, or afterwards, and if so, how?  Of course, this open account could not have been taxed otherwise than for its actual value.  All the property of the debtor on the book account was held by the creditor under a lease in perpetuity.  This amounted substantially to an absolute transfer. When the creditor became the owner of all the property that the debtor had or ever could have, it would seem to follow that this open account could not represent anything of much value.  The reversion in a lease of a railroad for 999 years was not shown or found to be of any value, and certainly this court cannot say as matter of law that it has.  The lessor company was in receipt of a fixed rental of $10,000 annually.  If we grant that the relator could have applied this rent on the open account, then the value of the account would be represented by a sum which would produce an income of $10,000 annually, and at the current legal rate of interest that sum would be less than $170,000.  But the reversion in the lease was liable to be cut off and extinguished at any time by the pending arrangement for merging the lessor in the lessee, when the obligation to pay the rent was to cease also.  Both the reversion and the right to receive rent were actually extinguished by the complete merger which took place and became operative in a few months after the assessment.  It is inconceivable that this open account, under any fair process of reasoning, could have had any substantial value at the date of the assessment, but to hold that it could lawfully be valued and taxed for more than $6,000,000 would seem to be impossible, except by the exercise of arbitrary power.

3. The discussion thus far involves only the question what is and what is not tangible taxable property.  The remaining questions are of a very different character.  They arise upon

**332** People ex rel. Manhattan Ry. Co. *v.* Barker. [Jan.,

Dissenting opinion, per O'Brien, J. [Vol. 165.

the defendants' contention that certain debts of the relator represented by outstanding bonds cannot be deducted from the gross assets in arriving at the actual value of the capital stock.

It is admitted that at the date of the assessment there were outstanding bonds of the New York Elevated Railroad Company to the amount of $9,500,000, including $1,000,000 of debenture bonds, so called. These bonds were issued and sold by that company to construct the railroad. They were assumed by the relator in the lease of 1879, and in the modified lease and merger agreement of 1884, so that it became primarily and directly liable for their payment. Even without the assumption clauses in these various instruments the relator would, as we have seen, become directly chargeable for the payment of these bonds under general rules of law, upon the completion of the merger and extinction of the New York company, which was effected long before the assessment as to that company. When the relator absorbed the lessee under the statute providing for a merger, the former became bound for the debts of the latter. The referee held that these bonds should be deducted, the Special Term held otherwise, but the Appellate Division sustained the referee. The contention of the defendants is that these bonds should not be deducted, for the reason that they represent a debt contracted in the purchase of non-taxable property, to wit, franchises. I am unable to discover the slightest foundation for this argument. The railroad got all of its franchises from the state, and no one claims that it paid anything for them. If the defendants' contention be correct, it would follow that the great railroads of the state that have leased other roads and assumed their bonded debt cannot be allowed to deduct such debts in ascertaining the value of capital stock, since the obligation to pay them was a purchase of franchises or non-taxable property. Such a rule would swell the nominal or paper value of the capital stock of many railroads enormously, but could not, of course, affect the real or actual value. It seems to me that the statute which forbids the

deduction of debts contracted in the purchase of non-taxable property has been made to play a part in this case that was never intended.   That is a statute of offsets.   It has nothing whatever to do with the process of ascertaining the *actual value* of any piece of taxable property.   If an individual owns a bond of $5,000, the value of that bond depends upon the solvency of the maker and the nature of the security. The fact that he also owes a deductible or non-deductible debt has nothing to do with the value of the bond, and that fact cannot enter into the process of valuation at all.   In this case the assessors and the courts have been engaged for nearly seven years in the process of ascertaining one fact, and that is the value of the relator's *capital stock.*   The debts that the relator must pay are a very important element in this process, but the *purpose* for which they were created is of no consequence, so long as they must be paid out of the corporate assets.   In valuing the capital stock of a corporation, if we exclude obligations which the corporation or a receiver would be bound to pay before distribution to stockholders, it is obvious that the result would be false and deceptive.   Here we have over $9,000,000 of bonds which all admit the relator must pay out of its assets before the stockholders can get anything.   If we refuse to deduct them we will simply produce a false result, since the apparent value of the stock will then be over $9,000,000 more than its real or actual value.   So it must, I think, be apparent that the statute in question has no application to the process of ascertaining the actual value of the capital stock of a corporation.   It was manifestly intended for another purpose.

4. The remaining item of indebtedness which the learned counsel for the defendants insists should not be deducted are the relator's own bonds, amounting to $10,302,458.33.   They are part of an issue of nearly $12,000,000.   It is argued that in ascertaining the value of the capital stock this item should not be deducted from the assets, for the reason that $8,814,423.33 of the amount was used to pay land damages, and, therefore, the debt was contracted in the purchase of

334. People ex rel. Manhattan Ry. Co. *v.* Barker. [Jan.,

Dissenting opinion, per O'Brien, J. [Vol. 165.

non-taxable property, to wit, franchises, and the balance of the item, namely, $1,488,035, was issued to take up dividend scrip held by stockholders which, on its face, was convertible into bonds, and hence the bonds so issued did not represent a debt at all. No one contends that any part of these bonds are not outstanding liabilities, which must be paid in full. That they represent a valid debt against the company is not questioned. These bonds and those considered in the preceding point are affected by the same argument, and it will be seen seen that the general proposition is that in ascertaining the actual value of the relator's capital stock nearly $20,000,000 of its unquestionable obligations must be ignored. It would astonish the investor or business man to learn that this was the legal method of ascertaining the actual value of the stock of a corporation. Certainly no sane man would ever buy the stock upon such a method of valuation. The error that produces such a result is to be attributed entirely to a misapplication of the statute which provides for deducting debts from the value of personal property as shown in the preceding point. That statute is section 9, title 2, chapter 13, part 1 of the Revised Statutes, and applies to the assessment of natural persons for personal property, and has no reference to the valuation of the capital stock of a corporation. (*People ex rel. Cagger* v. *Dolan*, 36 N. Y. 59.)

The regulations for the assessment of the capital stock of corporations are to be found in title 4 of the same chapter, and are entirely distinct from the general law. In ascertaining the actual value of the capital of a corporation, the necessity of deducting all debts and liabilities from the gross assets, arises not upon any specific statute, but from the very nature of the problem itself, since the actual capital can never represent anything more than what is left of the assets after discharging all the obligations due to creditors. Of what consequence is it, for instance, whether the bonds issued to replace the scrip dividends were sold to realize money for the discharge of an imperfect obligation, or for some other purpose? The bonds were put in circulation by the relator, and they

must be paid.    They are, therefore, a charge upon the corporate assets prior to the claims of the stockholders, and, hence, affect the value of the stock, and to the extent of the amount due upon them dimish the relator's actual capital.    How is it material in an inquiry concerning the actual value of the capital stock whether the rest of these bonds, amounting to over $8,000,000, were used to purchase franchises, or for some other purpose, so long as they are an admitted liability, and must be paid by the relator.    The payment must necessarily diminish the assets and to that extent the value of the capital stock.

That this statute applies to individuals only and has nothing to do with the process of valuing capital stock is plain from the reason of the thing.    Except for its enactment, he would not be entitled to have debts deducted from the assessed value of specific personal property any more than he is to have mortgages or other liens deducted from the assessed value of his real estate.    But the value of the personal property being ascertained, the owner is permitted to offset debts or not according to their nature and character.    In the case of corporations the thing that must be valued is the *capital stock*, an arbitrary term which represents nothing but the excess of aggregated assets over aggregated liabilities, and that process necessarily requires the assessor to determine the value of all assets, and the amount of all liabilities.    If either assets or liabilities are ignored, the result will not express the truth, but a falsehood, the magnitude of which may be measured by the value of the assets and the amount of the liabilities omitted from the calculation.    It is, therefore, inconceivable that the law requires or permits assessors, acting under oath, to omit any corporate debt from the process of valuing *capital stock* for taxation, when in plain language they are commanded to determine the *actual value*.    What public officer or honest man could swear that he had fairly and conscientiously valued the relator's capital stock after excluding $20,000,000 of its admitted liabilities for any cause whatever?

I am aware that the discussion of these questions in the courts below proceeded upon somewhat different lines, and so

it may not be amiss to examine the case on the ground selected by the defendants themselves. The proposition of the learned counsel for the defendants is that these bonds represent a debt contracted in the purchase of non-taxable property, namely, franchises, and, therefore, cannot be deducted in ascertaining the value of the capital. There is no dispute about the facts. They were sold in the market and the proceeds went into the treasury of the corporation from which all disbursements were made, and out of a general fund derived from earnings, bonds and all other sources the land damages were paid, and the question is whether the relator in paying these damages *purchased* franchises, or any other kind of property. It would be difficult, I think, to show that since the Corporation Tax Law of 1880 was passed franchises are non-taxable; but let it be assumed that they are. It is clear that the relator did not purchase any franchise with these bonds or any part of their proceeds. What it did was to pay large sums to individual property owners to satisfy judgments recovered as damages for injury to property out of the general treasury. It has already been shown that the money thus paid as damages was for property destroyed, and was, therefore, a total loss, since the relator got no property in return. The franchises of a corporation are conferred upon it by the state, and the relator had all the franchises that it has now before it paid the damages at all. It is not claimed that it paid anything to the state for these franchises, and it certainly did not *purchase* any franchises from the individuals to whom it paid the money since they had none to sell.

Finally, it has been suggested that the non-taxable property which the relator acquired by the payment of this vast sum as damages was light and air, but the relator had as much of both before it paid the damages as it had after. Moreover, it would be difficult to state how light or air may be capitalized and converted into property, or, if property at all, why it is not taxable. Much might be said in answer to this suggestion, but since I am convinced that upon mature reflection it will not be seriously entertained, it would not be profitable to

1901.] People ex rel. Manhattan Ry. Co. *v.* Barker. 337

N. Y. Rep.] Dissenting opinion, per O'Brien, J.

pursue the inquiry. Such a proposition when followed to its legitimate sequence would lead to some curious results. If an individual should erect a noisome factory in a populous neighborhood, and by his operations pollute the air with offensive odors and obstruct or deflect the light of the residents, it is quite likely that he would be condemned by the courts to pay large damages at the suit of some or all of the injured parties. But if he borrowed the money on his note or bond in order to pay the judgment, would it be seriously argued that the outstanding note or bond could not be deducted from his personal assessment, on the ground that the debt was contracted in the purchase of non-taxable property, to wit, light and air? I cannot perceive any distinction between the case supposed and that of the relator upon the conceded facts in the record.

The purpose for which a corporate debt was created is, as we have seen, immaterial in any inquiry as to the value of capital so long as it is a legal liability chargeable upon the assets. I have referred to the argument of the learned counsel for the defendants that the bonds in question cannot be deducted because they represent a debt created for the purchase of non-taxable property, not because it is considered material, but in order to see whether the argument had any basis of fact or law upon which to rest. That inquiry has suggested what would seem to be a glaring inconsistency in which the argument has involved both the assessors and the Special Term. There was no non-taxable property found among the relator's assets. Even the land damages, to pay which, it is said, this very item of debt was created, is treated as taxable property, and as we have seen, is included in the statement of relator's taxable assets. It is difficult to see how it can be held that these bonds represent a debt created for the purchase of non-taxable property, and in the same breath that the land damages, to pay which the debt, it is said, was created, represents *taxable assets*. It would seem to be plain that either one or the other of these propositions must be founded in error; I think that both are, and for reasons that I have attempted to state.

43

338   People ex rel. Manhattan Ry. Co. *v.* Barker.   [Jan.,

Dissenting opinion, per O'Brien, J.          [Vol. 165.

The scrip dividends were made to stockholders in lieu of cash applicable to that purpose, but diverted to construction account.   The scrip was convertible into bonds at the option of the relator, and it exercised the option and issued the bonds in place of the scrip.   I am not able to perceive why these bonds, sold in the market under such circumstances, and in the hands of innocent holders, or even the stockholders themselves, do not represent a debt just as valid and as sacred as any other debt that the railroad had contracted.   The learned Appellate Division correctly held that all these bonds should be deducted from the gross assets in arriving at the actual value of the capital stock.

I have not omitted to examine the case of *People ex rel. Cornell S. Co.* v. *Dederick* (161 N. Y. 195), but it has no application to any of the questions discussed here.   That case arose under the new Tax Law (Chap. 908, Laws of 1896), whereas the case at bar arose under the law in force in 1894, which was the Revised Statutes with their amendments.   The Statutory Construction Law has no application in the construction of the Revised Statutes.   It is said that the result in the court below amounts to a finding that the relator is insolvent, and that it escapes taxation.   That argument has very little to do with the questions in this case, but it is not quite true in point of fact.   It is still assessed upon its real estate, and all property that pertains to the nature of realty.   Including the Metropolitan, this amounts to over $14,000,000.   The special franchises for the purposes of taxation, under chapter 712 of the Laws of 1899, are valued for the present year at over $46,000,000.   If they are worth that now they must have been worth substantially the same in 1894, and these facts furnish as good a basis for the relator's perfect solvency, the market value of the stock and the ability to pay dividends, as can probably be shown by any other street railroad in the country.   They show the enormous value of the relator's franchises which could not have been included in the assessment in question, but account for the market value of the stock and the dividends.

1901.]  People ex rel. Manhattan Ry. Co. *v.* Barker.  **339**

N. Y. Rep.]       Opinion of the Court, per Haight, J.

While differing with the learned court below with respect to the two items mentioned, which were held to be taxable assets, the result of the discussion is the same. The amount of the deficiency of assets compared with the liabilities is not material, since the relator has not appealed.

The judgment should be affirmed, with costs.

Parker, Ch. J., Bartlett, Martin and Vann, JJ., concur with Haight, J., for reversal; Landon, J., concurs with O'Brien, J., for affirmance, except as to the two items of land damages and open account treated of by the Appellate Division, as to which Landon, J., expresses no opinion.

Order reversed, etc.

The following opinion was handed down upon the decision of a motion by the relator for a reargument:

Haight, J. It is now claimed that the relator is entitled to a deduction of $2,992,520 from the amount of its assessable assets, as approved by this court, on account of its surplus profits. This question was not considered by us in our review of the case, and we, therefore, think the question should now be determined. Section 3 of chapter 456 of the Laws of 1857 provides that "the capital stock of every company liable to taxation, except such part of it as shall have been excepted in the assessment roll, or as shall have been exempted by law, together with its surplus profits or reserved funds, exceeding ten per cent of its capital,  *  *  *  shall be assessed at its actual value, and taxed in the same manner as the other personal and real estate of the county." As we understand this statute, . the surplus profits or reserved funds mean the accumulations of the company of moneys or property in excess of the par value of the stock issued by it; that its real estate and personal property is to be assessed at its actual value in the same manner as the other personal and real estate of the county is assessed, up to the amount of the par value of the stock issued, and then the surplus profits or reserved funds that have been accumulated in addition which exceed ten per cent of its capital stock shall also be assessed at its

actual value and in the same manner. If, however, there is no surplus profits, or if the surplus does not exceed ten per cent of the capital stock, there is nothing to assess as surplus and nothing from which the ten per cent of the capital can be deducted. (*People ex rel. Citizens' El. Illuminating Co.* v. *Neff*, 26 App. Div. 542.)

In this case the relator's capital stock issued amounts to $29,925,200. The amount of its assessable assets, as determined by us in our modification of the order of the Appellate Division, is real estate $7,323,200 ; personal estate $9,492,306.62, thus showing an impairment of the capital of the relator of upwards of thirteen millions of dollars. There consequently could be no surplus from which a ten per cent deduction could be made. It is true that the books of the corporation show a surplus of $5,326.433 of earnings over and above interest and dividends paid, but it was claimed by the relator that the greater portion of this had been paid out in repairs and in the ordinary expenses of the company, and that the fund no longer was in existence as a surplus, and the findings of the referee, as adopted by the Special Term, support this contention, thus leaving no basis upon which a deduction for surplus can be made.

When this case was up for a review in this court upon a former assessment (146 N. Y. 304) the contention was that the assessors had adopted an improper basis in determining the assessable value of the relator's property. This contention we sustained and a reassessment was ordered. In sending the case back we made some suggestions upon the assumption that the capital stock remained unimpaired, and that there was a surplus, and stated that there should be a deduction of ten per cent of the capital. At the time it did not occur to us that the apparent surplus did not equal the ten per cent of the capital, and this oversight makes the statement then made erroneous in that particular.

We have carefully examined the brief of the relator's counsel upon the other questions involved in the case which have already been considered by us in the prevailing opinion. We

are, however, of the opinion that there is no question of law involved which has not already been considered.

The motion for a reargument should be denied, without costs.

Parker, Ch. J., Bartlett, Martin, Vann and Landon, JJ., concur; O'Brien, J., absent.

Motion denied.