In the Matter of the Application of THE CITY OF NEW YORK, Relative to Acquiring Title to the Elevated Railroad Structures, Tracks, Stations, Platforms, Stairways and Appurtenances of the MANHATTAN RAILWAY COMPANY, or by Whomsoever Owned, in East Forty-second Street, Constituting the Existing Forty-second Street Spur, in the Borough of Manhattan, City of New York, and Also to Acquire the Right to Extinguish All Rights, Easements and Franchises of Every Nature Whatsoever, of Said MANHATTAN RAILWAY COMPANY or by Whomsoever Owned, to Construct, Maintain and Use Said Elevated Railroad Structures, Tracks, Stations, Platforms, Stairways and Appurtenances.

THE CITY OF NEW YORK and Others, Appellants, Respondents; CENTRAL UNION TRUST COMPANY OF NEW YORK, as Trustee, etc., Respondent.*

First Department, May 9, 1930.

* See 126 Misc. 879.

618

*J. Osgood Nichols* of counsel, for the appellant, respondent, Interborough Rapid Transit Company.

*William Roberts* of counsel, for the appellant, respondent, Manhattan Railway Company.

*L. Howell LaMotte* of counsel, for the appellant, respondent, The City of New York.

*William H. Page* of counsel, for the appellants, respondents, Bowman-Biltmore Hotels Corporation, Bowery Savings Bank, Corn Exchange Bank and thirty other property owners assessed.

*Albert S. Wright* of counsel, for the appellant, respondent, Cooper Union for the Advancement of Science and Art.

*H. C. McCollom* of counsel, for the respondent Central Union Trust Company of New York, as trustee, etc.

*Charles A. Collin* of counsel, for the appellants, respondents, Bowman-Biltmore Hotels Corporation and others, in answer to claimants' main briefs.

*Harry T. Zucker* of counsel, for the appellant, respondent, Seward W. Ehrich, Inc.

*Frederick L. Wheeler* of counsel, for the New York Central Railroad Company, New York and Harlem Railroad Company and New York State Realty and Terminal Company.

*Philip A. Carroll* of counsel, for the appellants, respondents, Robert Walton Goelet, 145 East Forty-first Street Corporation, The National City Bank of New York and National City Realty Corporation.

*Thomas H. Baskerville* of counsel, for the appellant, respondent, The Manhattan Storage and Warehouse Company.

*Herbert H. Maass* of counsel, for the appellant, respondent, Pershing Square Building Corporation.

*George Welwood Murray* of counsel, for the appellant, respondent, The Equitable Trust Company of New York, as trustee, etc.

FINCH, J.   There is presented by this appeal a novel and interesting question in the law of condemnation.

From the final decree entered at an extraordinary Special Term awarding the sum of $975,438 with interest in a condemnation proceeding instituted by the city of New York to acquire the so-called private and public street easements, railway structure and franchise, constituting the elevated railroad spur in East Forty-second street, city of New York, the following parties appeal: The City of New York, Manhattan Railway Company (as owner and lessor of the property taken), Interborough Rapid Transit Company (as lessee), Equitable Trust Company (as trustee for second mortgage bondholders), certain property owners assessed for benefit, all of whom object to the amount of the awards made for the franchise, the elevated structure and the so-called easements of light, air and access.   In addition, Cooper Union objects that the assessments for benefit have been improperly distributed among the properties lying within the zone and are not laid in proportion to the amount of benefit received.   A single award was made to the Manhattan Railway Company, which is to be apportioned among the claimants according to agreement.

The controversy involves four items: (1) The value of the franchise obtained from the city and the State to build, maintain and operate the spur.   For this the trial court allowed $25,000. (2) The value of the elevated structure within the condemned area, including stations, platforms and staircase; allowed $120,438. (3) The cost of the necessary reconstruction and alteration of the station at East Forty-second street and Third avenue caused by the removal of the spur; allowed $80,000.   (4) The value of the so-called right to impair light, air and access appurtenant to the property abutting upon East Forty-second street; allowed $750,000. The principal of the award is thus $975,438, to which must be added the interest from the date of vesting of title, namely, December 7, 1923.

The aforesaid spur extended from the Forty-second street station of the Third Avenue Elevated railroad at Third avenue westerly approximately 900 feet through Forty-second street to a terminal at Park avenue opposite the Grand Central Station.   It was built

in 1878 under perpetual franchises granted to the Manhattan Railway Company and its predecessor, the New York Elevated Railroad Company (*Mayor, etc., of New York* v. *Manhattan R. Co.,* 143 N. Y. 1), pursuant to chapter 606 of the Laws of 1875, to provide through operation to the Grand Central Station. Owing to a serious accident a few months after its opening, the spur was changed to a shuttle service. This consisted of two trains having one or two cars each. These trains were operated simultaneously, one leaving the station where it had taken on passengers before the other could put into the same station. Without any additional charge, passengers were transferred to and from the spur. Except for certain alterations made in the stairway and station at Park avenue, occasioned for the most part by changes in the Grand Central Terminal, the spur at the time title vested was approximately the same as when the shuttle service was installed. In 1903 the spur was leased, along with all the elevated railroads in the boroughs of Manhattan and Bronx, by the Manhattan Railway Company to the Interborough Rapid Transit Company for a period of 999 years. The city owns the fee to the land in East Forty-second street in trust for street purposes. Upon this record it is fair to say that the cost of the operation of the spur exceeded by many thousands of dollars yearly the revenue therefrom, and that the taking by the city of the spur was a benefit to the claimants. In this connection, but without in any way deducing therefrom anything of evidentiary value, it is interesting to note the fact that the Brooklyn Elevated railroads, in seeking to eliminate operation where service produced a loss, voluntarily ceased certain elevated railroad operation and took down the structures. In the case at bar the Legislature first accorded to the railway an opportunity to do likewise without prejudice to its franchise rights. By chapter 788 of the Laws of 1917 the Legislature empowered the Public Service Commission with the approval of the board of estimate and apportionment to authorize the Manhattan Railway Company to remove this spur without prejudice to its franchise or its obligation to restore the railroad in the event such restoration should be deemed necessary or convenient for the public service. The railway company was, however, unwilling to remove the spur. The Legislature then enacted chapter 611 of the Laws of 1919, amending chapter 788 of the Laws of 1917 by adding thereto section 1-a, so as to provide that in the event that on or before the 1st day of October, 1919, no agreement could be reached with the Manhattan Railway Company as to the removal of said spur, the Public Service Commission upon request of the board of estimate and apportionment should conduct a hearing to determine whether

said spur was necessary and convenient to the public service or constituted an impediment to the public use of the street.

Upon the giving of a certificate by the Public Service Commission that the spur was no longer necessary or convenient to the public service, or was an impediment or obstruction to the public use of the street, the city was given the right to condemn and remove the same. Said act then further provided as follows: "Whenever the said board of estimate and apportionment determine it to be necessary or advisable to remove from the street such tracks, structure, station and appurtenances or such unit or portion thereof as shall have been determined by said Commission, the said City shall also condemn the rights, easements and franchises of the said Manhattan Railway Company to construct, maintain, operate or use said tracks," etc. It was then further provided that the costs, compensation and damages, for the payment of which the city shall become liable by reason of such condemnation proceeding, shall be paid and obtained in accordance with the provisions of title 4 of chapter 17 of the Greater New York Charter relative to the condemnation of real property for streets, parks, etc. The act of 1917 was further amended by chapter 635 of the Laws of 1923. Title 4 of chapter 17 of the Greater New York Charter (Laws of 1901, chap. 466, added by Laws of 1915, chap. 606, as amd.) provides for the assessment of the cost of acquisition upon the real property benefited by the improvement.

Considering now the various items of the award, and taking up first the item of $80,000 found at Special Term as the cost of the necessary reconstruction and alteration of the station at East Forty-second street and Third avenue caused by the removal of the spur, the city of New York expressly waives objection to this item as found and upon this record we affirm the finding.

As to the value of the franchise to build, maintain and operate the spur which the railroad company obtained from the city and the State, we agree with the trial court that for the purposes of valuation the franchise and the right of occupation of the street are so inseparably connected that they must be considered as a single entity. (*People ex rel. Metropolitan Street Railway Co.* v. *Tax Commissioners*, 174 N. Y. 417, at p. 441.) The rights of the railroad in the street were strictly limited by the franchise which it had acquired from the city and the State. Since the record shows that this spur could no longer be operated except at a larger annual loss and that the taking by the city was a distinct benefit to the claimants, and the Public Service Commission, after proceedings and hearings, having determined and ordered that the spur was no longer necessary and convenient for the public service, it, therefore,

follows that the right to run an elevated railroad in this street under these conditions was of no value.

Under the same conditions we are unable to ascribe to the elevated structure value other than what it would be worth taken down.

We come now to what is termed in its brief by the Interborough Rapid Transit Company as " the chief component element both of original cost and present value," namely, the so-called private street easements. It is the value of these rights, by whatever name they may be called, which presents the interesting question upon this appeal. A superficial impression would prompt the query why, if the franchise is worth nothing and the elevated structure has only a scrap value, should these so-called easements acquired to be used in connection with the operation of the railroad, be worth any more? The railroad, on the other hand, urges that these rights must be paid for not upon their fair market value as between a willing buyer and a willing seller, which has always been the measure in condemnation (*Matter of Simmons* [*Ashokan Reservoir, Sec. No. 6*], 130 App. Div. 350; affd., 195 N. Y. 573), but as measured by the benefit conferred upon the abutting property. This latter, however, has never been the principle applied in condemnation, and but slight consideration is sufficient to show that such a principle could not in fairness be applied. As Mr. Justice HOLMES, in *Boston Chamber of Commerce* v. *Boston* (217 U. S. 189, at pp. 194, 195), said: " The petitioners contended that they had a right, as matter of law under the Constitution, after the taking was complete and all rights were fixed, to obtain the connivance or concurrence of the dominant owner, and by means of that to enlarge a recovery that otherwise would be limited to a relatively small sum. * * * According to the contention, by a simple joinder of parties after the taking, the city could be made to pay for a loss of theoretical creation, suffered by no one in fact. The statement of the contention seems to us to be enough. It is true that the mere mode of occupation does not necessarily limit the right of an owner's recovery (*Boom Co.* v. *Patterson*, 98 U. S. 403, 408; *Louisville & Nashville R. R. Co.* v. *Barber Asphalt Co.*, 197 U. S. 430, 435). But the Constitution does not require a disregard of the mode of ownership — of the state of the title. * * * It merely requires that an owner of property taken should be paid for what is taken from him. It deals with persons, not with tracts of land. And the question is what has the owner lost, not what has the taker gained." And as the same justice said in *City of New York* v. *Sage* (239 U. S. 57, 61): " But what the owner is entitled to is the value of the property taken, and that means what it fairly may be believed that a purchaser in fair market conditions would have given for it in fact — not what

a tribunal at a later date may think a purchaser would have been wise to give, nor a proportion of the advance due to its union with other lots. The city is not to be made to pay for any part of what it has added to the land by thus uniting it with other lots, if that union would not have been practicable or have been attempted except by the intervention of eminent domain."

In considering the nature of these rights we first note that the parties have treated them as arising upon conveyances. A fair digest of a sample combination release and grant is as follows:

" WITNESSETH: * * * in consideration of the sum of Five thousand ($5,000) dollars, * * * the party of the first part hereby releases the parties of the last part and each of them, from all claims, damages, and cause or causes of action * * * and including all claims, damages and cause or causes of action for depreciation in the value of the said premises, and loss of rents, * * * and annoyance or injury to the owner or occupant, and interference with the use of the said premises, or the easements appurtenant to the same, produced by the construction, maintenance or operation of the elevated railroad.

" And, the party of the first part, hereby grants and conveys to the parties of the last part, their successors and assigns, all the right, title and interest of the said party of the first part in said East 42nd Street, and the land forming the bed thereof, and the easements therein, appurtenant to said premises, which are or may be necessary for the construction, maintenance and operation of an elevated railroad in said street, as the same is now constructed, maintained and operated, except as hereinafter stated; * * * and the party of the first part hereby authorizes and consents to * * * the operation of the said railroad through the said street and past the premises hereinbefore described, by the parties of the last part, their successors or assigns forever, without further compensation or further liability for any damages that may hereafter be sustained by the said premises or by the owner or occupant thereof, or by any person in privity of estate with the party of the first part, caused by said * * * operation of said railroad as the same is now constructed, maintained and operated, except that the parties of the last part and their successors or assigns may at any time hereafter use, in the operation of their railroads, electricity or any other motive power, and may also make such repairs to or alterations in the present structure as they may deem expedient; provided, however, that in no case shall said structures, or the operation of trains thereon be changed * * * so as to materially increase the encroachments upon the easements hereby released and conveyed or the existing burden upon the abutting property hereinabove described."

The railroad also acquired some of these rights by court action in cases instituted by the abutting owners for an injunction or, in the alternative, for money damages, and by condemnation and prescription. In the settlement of the injunction suits the railway company acquired only such rights as would have been acquired by a condemnation proceeding. (*American Bank Note Co.* v. *N. Y. El. R. R. Co.*, 129 N. Y. 252, at p. 270.) So, too, the rights acquired by the railway company by prescription were no greater than those acquired by condemnation. (*Hindley* v. *Manhattan R. Co.*, 185 N. Y. 335; *American Bank Note Co.* v. *N. Y. El. R. R. Co.*, 129 id. 252, 270.) It is to be noted, therefore, that the rights acquired by the railway company in all of these ways are identical. Also the instruments partook of a double nature. As relating to past damages, they were in the form of releases. As relating to continuing trespass and future damages, they were in the form of full covenant warranty deeds. (*People ex rel. Manhattan R. Co.* v. *Barker*, 165 N. Y. 305, at p. 316.)

These so-called easements have also been taxed as tangible property of the railroad. (*People ex rel. Manhattan R. Co.* v. *Barker, supra; People ex rel. Manhattan R. Co.* v. *Woodbury*, 203 N. Y. 231.) In the case last cited it was said for the court by Judge GRAY: " I think that the cost of the easements was properly included in ascertaining the value of the relator's tangible property. The structures in the street, upon the acquisition of those easements, became lawful as to the abutting property owners. They, then, became appurtenant to the railroad property and, necessarily, enhanced its value." Furthermore, they have been judicially valued as representing the amount which has been taken from the value of the abutting property after allowing for all the benefits received. (*Newman* v. *Metropolitan El. R. Co.*, 118 N. Y. 618, 623.) These rights, therefore, had value and could not have been acquired by the railroad for less than their cost to it. If the courts should now determine that these rights should be taken from the railroad and added to the respective properties of the abutting owners without compensation, the courts would be unjustly enriching the property owner at the expense of the railroad. While it is true that this proceeding is one between the city and the railroad, yet as a part of this same statute it is provided that the cost of acquisition of the property taken shall be assessed upon the property benefited. We must view the plan as a whole and the results sought to be accomplished. When the city assesses the cost of the acquisition of these easements against the property benefited, the easements are forever extinguished, even if the language of this special condemnation statute does not itself cause an extinguishment. Its language is

" and the extinguishment of all rights, easements and franchises therein." It would be unfair to the railroad to permit this value to be taken from it and added to the abutting property without compensation to the railroad.

The foregoing brings out clearly the difficulty of fixing a value for these so-called easements in accordance with general principles and not as arbitrarily determined. We cannot close our eyes to the fact that this condemnation is a present benefit to the railroad because, as noted, the operation of this spur was unprofitable. As these so-called rights when acquired by the railroad were of no use to it, except as it was compelled to acquire them in order to operate pursuant to its franchise, it would naturally follow that such rights would expire with the cessation of the operation of the railroad. We must, however, bear in mind the plan of condemnation as enacted in this special statute and the result accomplished thereby, and adopt a principle which shall do justice to all parties concerned. In the creation of these rights and all subsequent dealings therewith the courts have had in mind such a principle. As practically applied, it is to be noted that the courts proceeded on just this principle when they permitted these abutting owners to recover the damages which they suffered by reason of the erection and operation of this railroad.

Prior to the construction of the elevated railroads in the streets of the city of New York, the Court of Appeals had held that the owners of property abutting on public streets in the city had a right to have the street kept open in front of their property and this right was held to be private property. (*People* v. *Kerr*, 27 N. Y. 188; *Fearing* v. *Irwin*, 55 id. 486; *Egerer* v. *N. Y. C. & H. R. R. R. Co.*, 130 id. 108; *Coster* v. *Mayor, etc., of Albany*, 43 id. 399.) In addition, prior to the erection of the elevated railway structures in the city, the Court of Appeals had also held that the operation of a street surface railroad in a public street, the fee to which was in the city for street purposes, did not constitute a taking of the rights of abutting owners. (*Kellinger* v. *Forty-second Street, etc., R. R. Co.*, 50 N. Y. 206; *People* v. *Kerr*, 27 id. 188.) After the elevated structure had been erected in East Forty-second street, the Court of Appeals held that an owner of land abutting on the elevated railroad had easements of light, air and access in the street appurtenant to his lot which formed a part of his estate, and that the railroad in that street interfered with the free circulation of light and air and impaired his access to such an extent that it amounted to a taking of his property for a public use. (*Story* v. *N. Y. El. R. R. Co.*, 90 N. Y. 122.) In this *Story* case the title to

the bed of the street was in the abutting owners and the court allowed a recovery because the city of New York covenanted in the grant that the street upon which the property abutted should continue open forever. That case was followed by others where the same result was reached, even though the fee title to the streets for street purposes was in the city of New York. (*Lahr* v. *Met. El. R. Co.*, 104 N. Y. 268; *Kane* v. *N. Y. El. R. R. Co.*, 125 id. 164.) Here likewise the court held that abutting owners had easements of light, air and access, and the erection and operation of the elevated railroads impaired these easements to such an extent as to amount to a taking of private property for a public use.

Looking at the matter broadly, the courts saw that the property owners abutting upon a street wherein ran an elevated railroad, bore more than their fair share of community burden as against adjoining streets in which there was no elevated. Determining that such owners were justly entitled to damages, the courts then sought a theory upon which to sustain so just a result. Likewise in valuing the so-called rights which were taken, the courts proceeded upon principles designed to produce just results. In most instances the abutting property owners received benefits from the operation of the elevated railroad, as well as damages for the impairment of their light, air and access. In accordance with familiar principles, where property is taken in condemnation the fair market value is allowed to the owner for the property actually taken and benefit is not considered. Where, however, in condemnation not all the property of the owner is taken, in addition to allowing the fair market value of the property taken, the court allows consequential damage to the property still left in the hands of the condemnee. In estimating the amount of this consequential damage, benefit as well as detriment is taken into consideration. When the elevated structure was erected the stairways brought many people past the show windows of abutting owners and, because of the more rapid transit, also brought in more customers from other portions of the city. These customers were not only store customers but also were customers for dwellings and all other purposes, so that the value of the land in the vicinity was enhanced. In each case the abutting owner had only a small portion of his property taken and a large amount left in his hands, for which he was entitled to consequential damages. To meet this situation and produce just results the courts proceeded upon the principle that the easements taken were of nominal value and then proceeded to determine the amount of consequential damage to which the owner was entitled by awarding him such damage as the detriment exceeded the benefits. (*Bohm* v. *M. E. R. Co.*, 129 N. Y. 576, 588; *Sutro* v. *Manhattan Railway*

*Co.*, 137 id. 592, 593; *Bookman* v. *N. Y. E. R. R. Co.*, Id. 302, 304; *Livingston* v. *M. E. R. Co.*, 138 id. 76, 78.) Likewise, when the subway has been constructed and an elevated railroad spur has thereby become more or less obsolete, the court must reach a just result in accordance with legal principles, and not permit these rights to be taken from the railroad and added to the abutting property without compensation. Looking, therefore, at the result accomplished by the special statute pursuant to which this condemnation is had and the net result accomplished thereby, namely, that these rights acquired from the property owners are returned to them and extinguished (*Matter of Mayor, etc., of N. Y.*, 186 N. Y. 237, 244), we reach the conclusion that the railroad is entitled to compensation therefor. A contrary result would be unfair to the railroad because it would turn over these rights of property acquired by the railroad on a basis of judicial determination and restore them to the property owners at the expense of the railroad and without payment therefor by the abutting owners.

Having in mind the foregoing, we must ascribe some value to these rights. Since they were acquired upon a basis judicially determined, there is no middle ground between ascribing no value to them and valuing them for what has been judicially determined to be the amount by which the abutting property was damaged for all time in the future by the operation of the railroad. This should exclude any amount which the railroad at the time of acquisition paid for past damages, since the latter was then determined upon the basis only of making whole the abutting property owner for the damages suffered up to the time of trial. A different situation arises with reference to the so-called " fee damages " and it is only for the latter that the railroad is entitled to compensation herein. The distinction between these two classes of damage was well pointed out by Judge HAIGHT in *People ex rel. Manhattan R. Co.* v. *Barker* (165 N. Y. 305, 316): " The operating of an elevated railroad in a street in front of abutting property without acquiring from the owners the right so to do is an interference with and a partial destruction of such owners' easements of light, air and access. The structure is, therefore, to that extent unauthorized and illegal, and the company operating it is deemed to be a trespasser upon the right of such owners. *Hence, in an action brought to recover damages for such use, the company becomes liable for all of the damages that it has caused by reason of its unlawful structure, not only for its impairment of the owners' easements of light, air and access, but also for its interference with their privacy and their convenience. For the damages so recovered, no right or property of value is acquired by the railroad company. It is for others' property rights destroyed and for*

*injuries inflicted upon others that the company is compelled to make compensation in damages. Such damages, consequently, do not form a basis upon which any valid assessment can be made. It is quite different, however, as to the damages ordinarily denominated '. fee damages.' Such damages are awarded for rights acquired from others for all time to come, or at least during the existence of the railroad company.* The rights acquired are the easements of light, air and access of the abutting property owners in the streets occupied by the elevated railroad structure, and when these easements are acquired by the company its structure becomes lawful and its right to operate its road in front of the abutting property unquestioned. (*Messenger* v. *Manhattan R. Co.*, 129 N. Y. 502.) The acquirement of these easements, it is true, destroys in a measure the value of the abutting property, but to the extent that such value is destroyed, that of the railroad company is increased. We think, therefore, that the *fee damages represent property that may be assessed.*" (Italics not in original.)

We find, therefore, that these rights should be valued at the time of taking at not less than upon the basis judicially determined as their value at the time of their acquisition.

The question then arises, should they be valued at a greater sum? Considering, as we must, that they could only be used in connection with an elevated railroad or a kindred purpose, we are unable to find that these rights for such a purpose have increased in value over what they were worth when they were acquired. What the owner lost in value at the time of the taking has not since increased in value in the hands of the taker. If the attempt is made to value these rights as of greater worth in the hands of the railroad, it is only because either they would cost more to acquire to-day or they would benefit more, not the city, the condemnor, but those upon whom the city is to assess the cost of their acquisition, namely, the property owners. Neither of these considerations increases their value in condemnation in the hands of the railroad. In the first place, no one to-day would acquire them for the purpose of running an elevated railroad. This because of the changed city conditions including the advent of the subway. In the second place, this proceeding is between the city and the railroad. But if, as is fairer, we consider the statute as a whole under which this proceeding is brought, and particularly that part which provides for the assessment of the cost upon the property benefited, even then the amount of the benefit is not material, since in the language of Mr. Justice HOLMES, "the question is what has the owner lost, not what has the taker gained." (*Boston Chamber of Commerce* v. *Boston, supra.*) The city should, therefore, pay for

these rights upon the basis of what has been judicially determined to be their value at the time of their acquisition, which, of course, excludes any amount then paid for past damage.

The railroad urges that it might have abandoned the spur and sold these rights to the property owners. But such a proposition is based upon fanciful assumptions, to sustain which there is no evidence in this record. Testimony is lacking to show that any or a sufficient number of property owners would or could purchase said rights. The argument presupposes a relinquishment of all other damages because it would be necessary to demolish the structure and rebuild the Third Avenue station in order to deliver a single so-called easement. Market value cannot be predicated upon a single sale. In addition, it has already been judicially determined that such a consideration is a mere " hypothetical possibility." (*McGovern* v. *City of New York*, 229 U. S. 363; *City of New York* v. *Sage*, 239 id. 57.)

Taking up the objection of Cooper Union that the assessments for benefit have been improperly distributed upon the property lying within the assessment zone and are not laid in proportion to the amount of benefits received: Specifically Cooper Union objects that the assessment against so much of the Grand Central Terminal property as lies in Zone A is not laid in like proportion according to benefit as the assessment against the property of this appellant, Cooper Union. The latter admits, however, " It is true that the courts have approved a lower rate of assessment against strictly railroad properties." It is claimed, however, that the Grand Central Terminal is, strictly speaking, not railroad property and, therefore, the court below was in error in applying this rule. The question of the amount of benefit received by any parcel of real property is a question of fact to be considered upon the whole record, including a view of the property within the area of assessment. Having so viewed the property, the court has fixed the assessment for benefit and we find no reason upon this record to disturb this finding of fact. As was said by the court in *Matter of City of New York* (*Juniper Avenue*) (233 N. Y. 387, 392): " They [referring to the commissioners] may consider all the circumstances. A certain parcel may be held under such a restricted title as to enjoyment or alienation that a local improvement is of less advantage to it than to another parcel of equal size owned in fee simple absolute." (Citing cases.) Likewise Cooper Union urges that the assessments against properties along Forty-second street in Zone A should be reapportioned so as to increase the rate of assessment at the easterly and westerly extremities of the zone and decrease the assessments against the properties in the central

portion, upon the ground that the station was of wider construction at the two extremities and took more light, air and access and was of greater detriment to the properties at the two extremities than it was to the properties in the central portion. This likewise was a question of fact for the court at Special Term, taking into consideration all the evidence, including a view of the premises. Moreover, the rule is thoroughly well settled that unless an erroneous theory is shown to have been adopted, the finding of the trial court in apportioning assessments will not lightly be disturbed upon appeal. (*Matter of City of New York* [*Clinton Avenue*], 106 App. Div. 31; affd., 185 N. Y. 601; *Matter of City of New York* [*West 184th Street*], 165 App. Div. 356; affd., 216 N. Y. 642.) In the case at bar the record does not support the contention of the appellant Cooper Union that the rate of assessment against the property in the central part of Zone A should be decreased and that the rate of assessment against the property at the easterly and westerly extremities should be increased. The making of rates and the levying of assessments represent different functions. The first named is an exercise of the power of eminent domain and the other that of the taxing power. (*Genet* v. *City of Brooklyn*, 99 N. Y. 296; *People ex rel. Griffin* v. *Mayor, etc., of Brooklyn*, 4 id. 419.)

We, therefore, affirm the determination of the court at Special Term as to the cost of the necessary reconstruction and alteration of the station at East Forty-second street and Third avenue caused by the removal of the spur. To the franchise obtained from the city and State to build, maintain and operate the spur, we give no value. Nor do we allow any value to the elevated structure within the condemned area, including stations, platforms and staircase, except that which it would have when taken down. We value the rights to impair light, air and access appurtenant to the property abutting upon East Forty-second street at the time of the vesting of title herein upon the basis of the value judicially determined at the time of the original acquisition of these rights.

The decree appealed from should be modified in accordance with this opinion and as so modified affirmed. The parties in all probability will be able to agree upon the amounts, but if not, a referee will be appointed.

DOWLING, P. J., MERRELL, MARTIN and SHERMAN, JJ., concur.

Decree modified in accordance with opinion, and as so modified affirmed. If the parties are unable to agree upon the amounts a referee will be appointed. Settle order on notice.