In the Matter of the Application of THE CITY OF NEW YORK, Relative to Acquiring Title to the Elevated Railroad Structures, etc., in East Forty-second Street, Constituting the Existing Forty-second Street Spur, in the Borough of Manhattan, City of New York, etc.

Supreme Court, New York County, April 24, 1931.

*Arthur J. W. Hilly* [*John Lehman* of counsel], for the city of New York.

*Page & Page* [*William H. Page* and *John G. Dalton* of counsel], for the Bowman Biltmore Hotels Corporation and other property owners.

*Shearman & Sterling*, for Robert Walton Goelet and others.

*Jacob Aronson*, for the New York and Harlem Railroad Company and New York State Realty and Terminal Company.

*Parsons, Closson & McIlvaine* [*Albert S. Wright* of counsel], for the Cooper Union for the Advancement of Science and Art.

*Middlebrook & Singerbeaux* [*Thomas H. Baskerville* of counsel], for the Manhattan Storage and Warehouse Company.

*Edmund W. Van Voorhis* [*Herbert H. Maass* of counsel], for Pershing Square Building Corporation.

*George Welwood Murray*, for the Equitable Trust Company of New York, as trustee, etc.

*William Roberts*, for Manhattan Railway Company.

*James L. Quackenbush* [*J. Osgood Nichols* of counsel], for Interborough Rapid Transit Company.

*Davies, Auerbach & Cornell* [*H. C. McCollum* of counsel], for Central Hanover Bank and Trust Company.

MULLAN, J.   This matter is before me for the purpose of fixing the amount of money which the city of New York shall pay to the elevated railroad company for regaining and adding to the use of the people the portion of the space above the surface of the street formerly occupied by the elevated railroad structures in East Forty-second street, from Third avenue to Park avenue.   The matter was before the Special Term (126 Misc. 879) and the Appellate Division previously, at which times additional elements of compensation were involved.

When the case was decided by the Appellate Division (229 App. Div. 617) the court divided those elements into four items: (1) The value of the franchise to build, maintain and operate the spur and occupy the space (p. 619).   They decided (p. 622) that no monetary allowance should be made for those rights and they have not remitted that item for reconsideration.   (2) The value of the elevated structure.   The Appellate Division decided that item to be measurable by its value as taken down (p. 622).   The parties have agreed that the value so determined is $235, and I so find. (3) The cost of remodeling the station at Third avenue and Forty-second street, as to which the Appellate Division affirmed the Special Term, and did not remit the item for reconsideration. (4) The value of the so-called right to impair light, air and access appurtenant to the land abutting upon East Forty-second street. The sole question before me is fixation of the value of the " so-called rights " in item 4.   It is futile for me to discuss the nature of those rights.   In remitting the matter the Appellate Division has said that these " so-called rights " are property, and it has said (a) that the method by which they are to be appraised is to ascertain their value at the time of taking (by the city) upon the basis judicially determined as their value at the time of their acquisition (by the railroad; p. 628); (b) that the value as fixed must not be less than that sum (p. 628), and (c) that it should not be more than that sum (p. 629).   These " so-called rights " were acquired over a period of twenty years, in twenty different parts.   There are three of these " so-called rights " which until now were always said to be acquired by " prescription."   But on this hearing the city raises a question concerning a part of one of the three as to whether the rights were ever acquired by the elevated railroad.   This question, it seems, was not before the Appellate Division, which divided the

rights being considered by them into four classes, according to the method of their acquisition, (1) judicial determination in property owners' suits, (2) settlement, (3) condemnation, and (4) prescription. There is no mention of any class involving a dispute as to ownership in the elevated railroad company. It, therefore, becomes my duty to ascertain whether, as to the particular parcel now under discussion, there was an acquisition; and (as I have determined that there was, but by a method not mentioned by counsel in the Appellate Division) I must also determine whether the elevated railroad company is entitled to payment for a right acquired in this fifth way. The present part of the discussion relates to the land termed in the briefs " The Depew Place Frontage."

The elevated railroad company first set running the time of prescription on August 26, 1878, and if it had asserted its title continuously it would have acquired title by prescription on August 26, 1898. I overrule the contention of the city that the elevated railroad company is not entitled to any award for rights acquired by prescription. I rule that an award must be made for the rights appurtenant (1) to the hospital frontage extending 125 feet westerly from Lexington avenue; (2) to the part of the Grand Central Station frontage which extends westerly from the westerly line of Depew place as it formerly existed 128 feet 5 inches, and (3) to the Gallatin frontage of 100 feet on the south side, beginning 175 feet west of Lexington avenue. These were concededly acquired by prescription. The history of the Depew place frontage is as follows: In 1878, when the elevated road was built, the fee was in private persons who were owners of the easements. The elevated railroad could not acquire those rights by prescription until 1898. In 1885 the running of the prescription was interrupted by the acquirement of the fee for street use by the city. Although later the fee passed again into private hands, twenty years had not expired from the date of that grant when the city took all the rights here involved. Therefore, it seems quite evident that the elevated railroad company never acquired the rights by prescription. I think, however, it did acquire the rights the instant the city took title to the fee in 1885. The original franchise and the written consents gave to the elevated railroad company all the rights necessary to the operation of the spur which the city had. This grant quite evidently would have included the " easements of light, air and access " appurtenant to the Depew place frontage had it been owned by the city as a proprietor. It would seem axiomatic that the city when the franchise was granted and the consents were given did not retain any easements of light, air and access in the " frontage " of Lexington avenue north and south of East Forty-second street, nor in the

similar frontages of any street that the elevated railroad intersects. Having in 1878 granted such rights then appurtenant to the frontage in private ownership as to the Depew place frontage (which it at the time did not possess), the grant inured the instant the grantor acquired such rights. If the taking for street use in 1885 extinguished the easements, then the grant of the city and State conveyed the right to the elevated railroad company to prevent the assertion in future of any such rights. For our purposes these two kinds of rights are not distinguishable. It may very well be that a city street has no such easement in an intersecting street, for such easements have always been discussed as appurtenant to property privately held. But in 1885, simultaneously with the taking for street purposes, those rights, of whatever kind, passed to the elevated railroad company by the consents and the franchise.

The Appellate Division has ruled that the franchise and right to occupy are of no value. It has also ruled (p. 621) that for purposes of valuation the franchise rights and the right of occupation are an entity. This right to obstruct light, air and access as to an intersecting street is either a right given by the franchise or a right to occupy  Therefore, these rights have no value. If I am in error as to this, then these rights appurtenant to Depew place were not acquired by the elevated railroad company and the same result (no award) follows. Of course a different result might be reached if the city owned this land as a proprietor. It has been conceded that had compensation been allowed for the Depew place " frontage " its amount would be $29,157.48. The elevated railroad company urges that the right of light, air and access is not held by the city in trust, but is held by the city as a private owner. But as it is appurtenant to the land and the land is held solely in trust I cannot see how an appurtenant right to allow or prevent obstruction can be held in any capacity except in trust. If private trustees hold the land, surely the easements are held by them also in trust. There is no doubt that these " easements " are a different kind of property from any other appurtenant to land. But they exist as to all abutting land in private ownership. When the city takes title privately to a piece of land which has such easements appurtenant to it the easements are not wiped out. Such rights must exist in the elevated railroad company as to every street that the structure crosses or else be extinguished by the dedication to street use. Are they then of a different class from the right to incumber East Forty-second street? I do not think so. If these rights against the city have a value, for which the elevated railroad company must be compensated, then the right to incumber East Forty-second street has a value for which the railroad company

must be compensated, and the converse is also true. I confess that the ruling seems to create an anomaly, but I think that the anomaly is inherent in the nature of the right against the city. If such rights are of any value, a like value inures as to the width of Lexington avenue north and south of East Forty-second street. But that the city should pay to recover the Lexington avenue rights (even after my tentative opinion suggested it) is not claimed. I think Depew place, as to the rights to invade the light, air and access, is in the same category as other intersecting streets. The railroad acquired them under the consents and franchise as appurtenant to the use of the city streets. The fact that the street has been since closed does not alter their character. That they will be returned to the abutting land (now in private hands) is immaterial (229 App. Div. 622). Furthermore, throughout the entire elevated railroad litigation no right granted by the city other than as a proprietor has ever been considered as being this kind of an easement. The railroad has never been taxed for the right to cross a city street as on an easement of this character, and it never paid for such a right.

As to the block between Third and Lexington avenues, my task is in effect that of an accountant. In accordance with the instructions of the Appellate Division I award $4,500 for the Goelet rights on the north side, frontage fifty-two feet ten inches; $1,500 for the Hernon rights, frontage twenty-five feet; $2,200 for the O'Brien rights, frontage twenty-five feet; $5,000 for the Wescott rights, frontage fifty feet; $17,500 for the H. W. Goelet rights on the south side, frontage one hundred and ninety-five feet; $5,000 for the Renwick rights, frontage eighty-three feet four inches. These figures, which were before the Appellate Division, make it quite clear that an average value per front foot is to be applied. These items of fee damage per front foot vary from $60 to $100. The city urges that an average is unjustified and that no method of applying the criterion of judicial determination is possible. The method of average has authority other than that of the Appellate Division (*Langdon* v. *Mayor*, 133 N. Y. 628), which, of course, I consider only to construe their meaning. I am bound to follow their instructions. Applying the average, I determine that the value per front foot on the block from Third avenue to Lexington avenue as determined judicially is $82.80. Applying this unit to the frontages not involved in the judicial determinations, we get a sub-total of $33,851.40, and adding the sum of the judicial determinations, we get a total of $69,551.40, which I award as the damage for the easterly block. I agree with the contention of the elevated railroad company that the units in the two blocks are so different

in amount that the blocks should be separately considered. When I seek to apply the above method to the westerly block (which I rule I must do) the task becomes more intricate. On that block there are but two judicial determinations of entire fee damage, both on the south side, which result in a unit of $596 per front foot. On the north side there are but three judicial determinations, which, unfortunately, do not determine the whole fee damage. This happens as follows: The land was held as one piece by Pinchot as tenant under a long term lease. The reversion, however, was divided into three parts, each reversioner being entitled to a distinct plot of the land. Winthrop had the reversion of the westerly seventy-five feet; Kernochan that of the fifty feet next east, and McKim that of the twenty-five feet next east. The fee damage to those reversions was judicially determined in three actions. The units are identical, $413.33 per front foot. The leasehold interest had been submitted for judicial determination, but the judge before whom the suit was pending died before judgment. The suit was then settled for $36,000. If we can determine what part of the settlement was fee damage we can add it to the value of the reversionary fee damage and obtain the total damage and we may then average that with the $596 unit on the other side. The elevated railroad company, without waiving its right to attack the rule of award, urges two ways in which the Appellate Division method may be applied. It showed on trial that in several instances in its settlements it adopted a method of appraising fee damage and giving as rental damage six per cent on that sum. If we apply that method the fee damage to the leasehold interest is $19,742. I can merely say that the method is crude in the extreme; not based on judicial determination and plainly *quo ad hoc*. One alternative to the adoption of that unit is to rule that the only judicial unit established is $596. This alternative is not suggested by any one and is not adopted. The second method adverted to by the elevated railroad company is to average with the $596 unit on the south side the partial fee damage unit on the north side. This, admittedly, will not give a correct unit and will result in no award for any part of the $36,000. It is rejected. It seems to me, however, that there is a method of arriving at the fee damage to the leasehold " upon the basis of the judicial determination " of the fee damage to the reversion. An analysis of the three partial awards shows (1) that a single unit for fee damage was employed; (2) that a single unit (different from that just mentioned) was employed for rental damage; (3) that the unit of interest was the same on all parcels, and (4) the only difference in any amount per front foot is a slight variation in costs, which can be disregarded. Using these

units we find that the fee damage caused to the reversion bears to the total award a ratio of 62 to 97. These awards were made for the identical use to which all four parties put the land, and, therefore, the same ratio may be applied to the fourth interest (*i. e.*, leasehold), and if we use that criterion we are determining the leasehold fee damage " upon the basis of judicial determination." This gives: Fee damage 64 per cent, other items 36 per cent of the total paid (more accurately 63.824568 per cent and 36.175432 per cent).

The result reached accords almost exactly with the value of the easements as found for the entire road (*People ex rel. Manhattan Ry. Co.* v. *Barker*, 165 N. Y. 305, 315), where the court found that the fee damage was two-thirds of the total paid. This method results in a figure for the leasehold fee damage of $22,976.84. Adding that sum to the fee damage of the reversion rights we get for the total judicial determination on the north side $84,976.84, which I award. From this, by average with the $596 unit across the street, the unit for the westerly block is computed as $581.1497 per front foot. The railroad waives the slight arithmetical error caused by the fact that the unit of $596 should be slightly higher because the lots are not full depth. I allow for the Shaw frontage of one hundred and thirty feet one inch $77,500. The totals, eliminating Depew place (for which no award is made), are as follows: Easterly block, $69,551.40; westerly block (eliminating Depew place), $469,566.01; alteration of station, $80,000; structure, $235. Total award, $619,352.41. If the three reversionary interests had been calculated on the entire depth to Forty-third street, as the leasehold was, we would have another method for figuring the value of the leasehold " on the basis of judicial determination " by comparing the land value of the reversion with the value of the building on the leasehold owned by the lessees. Unfortunately, however, the value of the reversion is calculated only for the half of the plot fronting on Forty-second street. The extra depth had a frontage both on Depew place and on Forty-third street. Supplying the defect in judicial determination by estimating that the extra depth is worth three-quarters of the Forty-second street frontage makes the land worth $376,000. The building was worth $135,000. This gives a ratio of 64 to 36, the same as is found by the method mentioned *supra.* I do not adopt this method because it involves factors not covered by judicial determination. I only mention it to show that in all probability the proportion found is accurate and that the Court of Appeals in adopting (in the *Barker* case), for fee damage, a ratio of two-thirds of the total paid was mathematically correct and that it did not fix a merely arbitrary ratio.